UNITED STATES DISTRICT COURT
FOR THE
NORTHERN MARIANA ISLANDS

EDWARD TEMENGIL, et al., ) CV No. 81-0006
 )
 Plaintiffs, )
 )
 vs. ) DECISION
 )
TRUST TERRITORY OF THE )
PACIFIC ISLANDS, JANET )
McCOY*, High Commissioner )
of the Trust Territory of )
Pacific Islands, UNITED )
STATES DEPARTMENT OF THE )
INTERIOR, JAMES WATT*, )
Secretary of the Interior, )
and UNITED STATES OF )
AMERICA, )
 )
 Defendants. )
_____ )

## TABLE OF CONTENTS

| | Page |
|-----------------------------------------------------------------|------|
| I. Facts | 6 |
| II. Standards of Review | 8 |
| III. The Evolution of United States Administration of the Trust Territory | 9 |
| IV. Trusteeship Agreement Claims | 14 |
| A. People of Saipan's Comity Doctrine and the Covenant's Elimination of High Court Jurisdiction in the NMI over Actions Filed on or After January 9, 1978. | 16 |
| 1. The Covenant and its Implementation. | 17 |
| 2. 48 U.S.C. § 1681(a) | 21 |
| 3. Conclusion | 25 |
| B. The Federal Agency Status of the Trust Territory Government and the High Commissioner for Purposes of Determining Liability for Trusteeship Agreement Violations | 26 |

*Pursuant to Federal Rule of Civil Procedure 25(d)(1), the Court has substituted High Commissioner Janet McCoy and Secretary of the Interior James Watt in place of the original defendant officials.

Page

C. Rulings on the Motions

 1. Trust Territory Government
and the High Commissioner . . . . . . . . 35

 2. The United States, the Interior
Department and the Interior
Secretary . . . . . . . . . . . . . . . 38

 a. Monetary Claims . . . . . . . . . . . 43

 b. Non-Monetary Claims . . . . . . . . . 45

V. Civil Rights Acts Claims Against the Trust
Territory Government and the High Commissioner

 A. Introduction . . . . . . . . . . . . . . . 48

 B. § 1981 Claims

 1. Jurisdiction: The Applicability of
§ 1981, Title VI and Title VII to
the Trust Territory Government and
the High Commissioner Through the
Operation of Covenant § 502(a)(2) . . . . 52

 a. Statutory Construction Principles . . 52

 b. Application of the Statutory
Construction Principles above
to Covenant § 502(a)(2) . . . . . . . 58

 2. Issues Relevant to Defendants'
Summary Judgment Motion . . . . . . . . : 65

 C. § 1983 Claims . . . . . . . . . . . . . . . . 69

 1. Applicability of the Equal
Protection and Due Process Guarantees
of the Fifth and Fourteenth Amendments
to the United States Constitution to
the Trust Territory Government and the
High Commissioner . . . . . . . . . . . . 70

 2. The High Commissioner's Promulgation
of the Trust Territory Headquarters
Salary Plan As Action Under Color of
Territorial Law for Purposes of § 1983

 a. Action Under Color of Territorial Law.. 74

 b. The Trust Territory of the
Pacific Islands as a "Territory"
for Purposes of § 1983 . . . . . . . . 75

 Page

 3. The Trust Territory Government and
 the High Commissioner as Suable
 "persons" under § 1983 . . . . . . . . . . . . 81

 D. Title VI Claims . . . . . . . . . . . . . . . . 82

 E. Title VII Claims . . . . . . . . . . . . . . . . 84

 VI. Civil Rights Acts Claims Against The United
 States, The Interior Department And The
 Interior Secretary . . . . . . . . . . . . . . . . 86

 A. § 1981 Claims . . . . . . . . . . . . . . . . 86

 B. § 1983 Claims . . . . . . . . . . . . . . . . 87

 C. Title VI Claims . . . . . . . . . . . . . . . 87

 D. Title VII Claims . . . . . . . . . . . . . . . 88

VII. Trust Territory Code Bill of Rights Equal
 Protection Claims

 A. Claims Against the Trust Territory
 Government and the High Commissioner . . . . 89

 B. Claims Against the United States, the
 Interior Department and the Interior
 Secretary . . . . . . . . . . . . . . . . . . 90

VIII. Conclusion . . . . . . . . . . . . . . . . . . . . 91

LAURETA, District Judge:

Plaintiffs represent a proposed class of present and former Micronesian employees who have worked at the Trust Territory government's headquarters on Saipan in the Northern Mariana Islands (NMI) during the period between January 9, 1978 and the present. They bring this action under 42 U.S.C. § 1983. They assert monetary, injunctive, and declaratory claims under the Trusteeship Agreement,[1] 42 U.S.C. § 1981, 42 U.S.C. § 2000(d) et seq. (Title VI), and 42 U.S.C. § 2000(e) et seq. (Title VII). They contend that the Trust Territory's employee salary plan discriminates on the basis of race and national origin in violation of: (1) the Trusteeship Agreement and the United Nations Charter;[2] (2) the equal protection and due process guarantees of the Fifth and Fourteenth Amendments to the United States Constitution; (3) § 1981; (4) Title VI; (5) Title VII; and (6) 1 Trust Territory Code § 7 (the equal protection guarantees of the Trust Territory Bill of Rights).

Defendants move to dismiss for lack of subject matter jurisdiction and for failure to state a claim. They alternatively move for summary judgment. The Court treats the motions as alternative motions to dismiss for lack of subject matter jurisdiction or for summary judgment. For reasons explained in this decision, the Court rules as follows:

1. <u>Motions By the Trust Territory government and the High Commissioner</u>
The Court denies the dismissal and summary judgment motions by the Trust Territory and the High Commissioner as to all claims except plaintiffs'

Title VI and Title VII claims. On the basis of 42 U.S.C. § 2000d-3, the Court dismisses Title VI claims for lack of subject matter jurisdiction. Because of plaintiffs' failure to comply with 42 U.S.C. § 2000e-5(e), the Court dismisses the Title VII claims on the same ground.

2. Motions By the United States, the Interior Department and the Interior Secretary

The Court dismisses the monetary Trusteeship Agreement claims, the § 1981 claims, the § 1983 claims, the Title VI claims, and the Trust Territory Code Bill of Rights equal protection claims against the United States, the Interior Department and the Interior Secretary for lack of subject matter juris- diction. The Court denies dismissal and grants summary judgment to these defendants on plaintiffs' Title VII claims. It denies both dismissal and summary judgment on plaintiffs' non-monetary Trusteeship Agree- ment claims against these defendants.

In so deciding the Court specifically holds that:

1. Plaintiffs may assert their Trusteeship Agreement claims in this Court without first pursuing the claims in the Trust Territory High Court;

2. The Trust Territory government and the High Commissioner of the Trust Territory are agencies of the United States under 48 U.S.C. § 1681(a) and therefore they are federal agencies for purposes of determining liability for Trusteeship Agree- ment violations;

3. § 1981, Title VI and Title VII apply within the NMI to the Trust Territory government and the High Commissioner;

4. The equal protection and due process guarantees of the Fifth Amendment or Fourteenth Amendment to the United States Constitution operate against the Trust Territory government and the High Commissioner;

5. The Trust Territory of the Pacific Islands is a "Territory" for purposes of § 1983; and

6. The Trust Territory government and the High Commissioner are suable "persons" under § 1983.

## I. FACTS

High Commissioner Executive Order No. 119 (May 25, 1979)[3]
is the most recent embodiment[4] of the salary plan which plaintiffs
challenge. The plan establishes three base pay schedules for
each Trust Territory government position. Citizens of the Trust
Territory or of "Southwest Pacific or Southeast Asian countries"
receive Schedule I salary rates. Citizens of the United States,
Canada, the United Kingdom, Australia or "Northwest European
countries" receive Schedule III salary rates. Employees who are
citizens of neither the Trust Territory nor Schedule III countries
receive Schedule II salary rates. A Schedule I employee in a
given position receives approximately one-half the salary of a
Schedule III worker assigned to the same position.

In January 1981 plaintiffs filed this class action
under 42 U.S.C. § 1983 against the Trust Territory, the High
Commissioner, the Interior Department, the Interior Secretary and
the United States.[5] They amended their complaint in July 1982.
They seek to represent a proposed class[6] of approximately four
hundred present and former Trust Territory government employees
who describe themselves in terms of race and national origin as
Micronesian,[7] and who have worked at the Trust Territory govern-
ment's headquarters on Saipan in the NMI between January 9, 1978
and the present. They invoke jurisdiction under 28 U.S.C. § 1331,
28 U.S.C. § 1343(a) and (4), 48 U.S.C. § 1694(a) and 48 U.S.C.
§ 1694(b).

Plaintiffs aver that the Trust Territory's salary plan

discriminates against them on the basis of race[8] and national origin and therefore violates: (1) the Trusteeship Agreement; (2) United Nations Charter[9]; (3) the equal protection and due process guarantees of the Fifth and Fourteenth Amendments to the United States Constitution; (4) § 1981; (5) Title VI; (6) Title VII; and (7) 1 Trust Territory Code § 7, which embodies the equal protection and non-discrimination guarantees of the Trust Territory Bill of Rights.[10] They ask the Court for declaratory relief, to permanently enjoin defendants from maintaining the salary plan and to award back pay calculated under Schedule III from January 9, 1978.

Defendants move to dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and under Rule 12(b)(6) for failure to state a claim. They alternatively move under Rule 56 for summary judgment. Initial argument on the motions occurred on May 8, 1981. While the motions were under advisement, plaintiffs amended their complaint on July 14, 1982. After three stipulated time extensions, the Trust Territory and the High Commissioner answered the First Amended Complaint on October 15, 1982. Defendants renewed their dismissal and summary judgment motions and final oral argument occurred on February 24, 1983.

The Court has considered affidavits and other extra-pleading material submitted by the parties.[11] Under Rule 12(b), the 12(b)(6) motions convert into summary judgment motions. The Court accordingly treats defendants' motions as alternative motions to dismiss for lack of subject matter jurisdiction or for summary judgment.

432

## II. STANDARDS OF REVIEW

On a motion to dismiss for lack of subject matter jurisdiction, the Court must construe the complaint in plaintiffs' favor. Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). The Court evaluates the entire complaint, rather than the jurisdictional statement alone, to determine whether there is a basis for jurisdiction. 5 Wright & Miller, Federal Practice and Procedure; Civil § 1350 at 551-552 (1973); id., § 1206 at 77-78. It liberally reads the complaint to ascertain whether the allegations establish jurisdiction on grounds other than those pleaded. Hildebrand v. Honeywell, 622 F.2d 179, 181 (5th Cir. 1980); see Aguirre v. Automotive Teamsters, 633 F.2d 168, 174 (9th Cir. 1980).

Summary judgment is appropriate only if no material factual issue exists and movant is entitled to judgment as a matter of law. U.S. v. First National Bank of Circle, 652 F.2d 882, 887 (9th Cir. 1981). The Court must construe the pleadings, other record evidence and its attendant inferences most favorably to plaintiffs. Harlow v. Fitzgerald, ___ U.S. ___, ___, n.26, 102 S.Ct. 2727, 2737 n.26, 73 L.Ed.2d 396 (1982). A genuine factual issue may exist only if a viable legal theory would entitle plaintiffs to judgment if they prove their asserted version of the facts. Ron Tonkin Gran Turismo v. Fiat Distributors, 637 F.2d 1376, 1381 (9th Cir. 1981), cert.denied ___ U.S. ___, 102 S.Ct. 128, 70 L.Ed.2d 109 (1981).

///

### III. THE EVOLUTION OF UNITED STATES ADMINISTRATION
### OF THE TRUST TERRITORY

This case arises during a period of profound change in the governance of the Trust Territory. Although the United States still administers the area under the Trusteeship Agreement, since the mid-1970's the Trust Territory's people have entered into new negotiated relationships with the United States which afford them expanded powers of self-government.[12/]

The Covenant[13/] memorializes the new relationship in the NMI. It represents the fulfillment of the United States' obligation under the Trusteeship Agreement to promote the development of self-government or independence in accordance with the freely expressed wishes of the NMI's people.[14/] See, e.g., S.Rep.No. 433, 94th Cong. 1st Sess. 23 (1975)(S.Rep.No. 433).

The parties' major disagreement concerns the effect upon the Trust Territory government of the Covenant's provisions on judicial authority and the applicability of federal laws. In order to understand the historical context of these issues, it is helpful to examine the evolution of United States administration of the Trust Territory.

Articles 73-91 of the United Nations Charter provide for a trusteeship system for dependent non-self-governing areas. Since 1947 the United States has administered the NMI, the Caroline Islands and the Marshall Islands as a "strategic" trusteeship.[15/] The United States disavows de jure sovereignty over the Trust Territory[16/] and has the duty to treat the Trust Territory's people

"with no less consideration than it would govern any part of its sovereign territory." People of Enewetak v. Laird, 353 F.Supp. 811, 819 (D.Haw. 1973), quoting 2 U.N. SCOR (116th meeting) at 473 (1947) (statement by the United States Representative to the United Nations Security Council). The relationship between the United States and the Trust Territory's people is "a fiduciary one... [in which] the interests of the inhabitants of the territory become paramount." Leibowitz, The Marianas Covenant Negotiations, 4 Fordham Int'l L.J. 19, 79 n.236 (1980), quoting Comment, International Law and Dependent Territories: The Case of Micronesia, 50 Temple L.Q. 58, 60 (1976).[17/]

The United States-drafted[18/] Trusteeship Agreement grants the United States full powers of administration, legislation and jurisdiction subject to the specific obligations undertaken in the agreement.[19/] Under 48 U.S.C. § 1681(a), the United States' authority rests in agencies designated by the President until Congress provides otherwise.[20/] The President delegated this authority to the Interior Secretary.[21/] Pursuant to this delegation, the Interior Secretary initially vested executive and legislative power in a High Commissioner and judicial power in a High Court.[22/] In 1964, Interior Department Secretarial Order No. 2882 created a popularly-elected Congress of Micronesia to exercise legislative authority, subject to final veto by the Secretary. See S.Rep.No. 433, supra, at 29.

Trusteeship Agreement Article 6.1 requires the United States to develop self-government or independence in the Trust Territory.[23/] This obligation is recognized as the United States'

most fundamental duty as trustee. See note 16, supra. Analyzing the history of governance by secretarial order, a court concluded in 1973 that "there does not appear to have been any significant delegation of authority to the citizens of the Trust Territory." People of Saipan v. United States Department of the Interior, 356 F.Supp. 645, 655 (D.Haw.1973), aff'd as modified on other grounds 502 F.2d 90, 94-95, 98 and n.10 (9th Cir. 1974), cert.denied 420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761 (1975).

Micronesian calls for meaningful self-determination[24/] resulted in the initiation of negotiations[25/] to define new status relationships with the United States. The NMI's historical pursuit of formal political union with the United States[26/] culminated in congressional approval of the Covenant on March 24, 1976.[27/] See generally Note, United Nations Trusteeship, 21 Harv. Int'l L.J. 204 (1977). Upon termination of the trusteeship, the NMI will become a self-governing commonwealth under United States sovereignty pursuant to Covenant § 101.

Although the NMI officially remains part of the Trust Territory, most of the Covenant is already effective. Congressional approval of the agreement automatically implemented some of its provisions. See Covenant § 1003(a). A three-branch commonwealth government has functioned under a locally-drafted and promulgated Northern Mariana Islands Constitution (NMI Constitution)[28/] since January 9, 1978. The NMI Constitution and additional Covenant sections became operative on that date pursuant to a presidential proclamation mandated by Covenant § 1003(b).

436

See Proclamation No. 4534, 42 Fed.Reg. 56593 (1977), reprinted in 48 U.S.C. § 1681 note. Covenant sections 401-403 were among the provisions which took effect. Those sections authorize the creation of a federal district court for the islands. Congress has implemented them by enacting 48 U.S.C. 1694-1694e (1977). Sections 1694a(a)[29]/ and (b)[30]/ define the federal court's trial jurisdiction. The presidential proclamation also brought into force Covenant sections 501(a)[31]/ and 502(a)(2)[32]/, which concern the applicability of the United States Constitution and federal laws.

Immediately after Congress approved the Covenant, the Interior Secretary created a temporary government to administer the NMI separately from the rest of the Trust Territory during the interim preceding the § 1003(b) proclamation. Interior Department Secretarial Order No. 2989, 41 Fed.Reg. 15892 (1976) (Order 2989). Order 2989 granted the Congress of Micronesia and the High Court limited residual authority in the NMI during the order's period of effectiveness. Id., part VII, § 2; id., part XII. When the § 1003(b) proclamation issued on January 9, 1978, Order 2989 became ineffective. Id. part XIV; see Sablan Construction Co. v. Trust Territory, 526 F.Supp. 135, 140 (D.N.M.I.App.Div. 1981). The Trust Territory and the High Commissioner concede that on that date the Covenant and the NMI Constitution completely superceded the Trust Territory government's secretarially-conferred NMI authority. Answer to the First Amended Complaint by Defendants Trust Territory and High Commissioner, paragraphs 5, 9, 10, 19.

The Trust Territory government now consists of an executive branch headed by the High Commissioner and a judiciary headed by the High Court. The High Commissioner's functions are primarily budgeting and accounting responsibilities for funds which the Trust Territory government transfers from the United States to the new governments of the Federated States of Micronesia (FSM), the Republic of Palau and the Republic of the Marshall Islands. Defendants United States Memorandum in Support of Defendants' Motion to Dismiss at 7. The Interior Secretary dissolved the Congress of Micronesia through Interior Department Secretarial Order No. 3027, 43 Fed.Reg. 49858 (1978). The FSM Congress, the Republic of Palau's Olbiil Era Kelulau and the Republic of the Marshall Islands' Nitijela now exercise plenary legislative power within their respective jurisdictions in accordance with locally drafted and adopted constitutions.

The Trust Territory government's headquarters remains on Saipan in the NMI.[33/] There are no plans to relocate it. Defendants United States Memorandum In Support of Defendants' Motion to Dismiss at 7. Part VII of Order 2989 mentioned relocation in apparent response to a letter to the Interior Secretary written after the Covenant negotiations ended by the President's Personal Representative to the negotiations. See Letter to the Secretary of the Interior from the President's Personal Representative (Nov. 4, 1975), attachment no. 2 to Defendants' Joint Opening Memorandum. Although the President's Representative was evidently authorized to discuss relocation during negotiations, his letter states that

the subject never arosè. Id.. During Senate hearings on the Covenant, the President's Representative affirmed the United States' "long recognized" responsibility to fund the transfer of the headquarters to a site chosen by the Micronesians. Hearing on H.R. Res. 549 Before the United States Senate Committee on Foreign Relations, 94th Cong., 1st Sess. 41, 44 (1975)(Senate Foreign Relations Committee Hearing on H.R.Res. 549). Other Covenant legislative history suggests that the negotiators considered studying the possibility of relocating the headquarters. See S.Rep.No. 433, supra, at 219, 227-230, 242. Testimony before Congress acknowledged the Trust Territory government's presence in the NMI as an unresolved major problem. S.Rep.No. 596, 94th Cong.2d Sess. 9 (1976)(S.Rep.No. 596), reprinted in 1976 U.S. Code Cong. & Ad. News 448, 456 (1976 USCAN).

## IV. TRUSTEESHIP AGREEMENT CLAIMS

The Trusteeship Agreement creates direct and affirmative rights which are judicially enforceable in federal courts. People of Saipan, 502 F.2d at 97. Congress, the executive branch and commentators have described those rights as unprecedented among trusteeship agreements in their detail, precision and scope. S.Rep.No. 471, 80th Cong. 1st Sess. 5 (1947); Trusteeship Agreement for the Territory of the Pacific Islands: Hearing on S.J. 143 Before the United States Senate Committee on Foreign Relations, 80th Cong. 1st Sess. 6 (1947)(testimony by Secretary of State Marshall); L. Goodrich, E. Hambro & A. Simons, Charter

of the United Nations: Commentary and Documents 508 (3d ed. 1969); J. McNeill, The Strategic Trust Territory in International Law 218, 230 (1974)(doctoral thesis reproduced by University Microfilms International, 1976).

Defendants seek dismissal or summary judgment on three grounds. First, they state that plaintiffs must initially assert their Trusteeship Agreement claims in the High Court. They predicate this argument upon People of Saipan, 502 F.2d at 99. For reasons explained in Part IV-A, the Court rejects this contention. Second, defendants maintain that the Trust Territory government is not a federal agency, and that therefore they cannot be held liable for the High Commissioner's actions as territorial chief executive. This argument fails for reasons stated in Part IV-B. Third, the United States, the Interior Department and the Interior Secretary (the Interior defendants) submit that the Trusteeship Agreement is not judicially enforceable in this action because: (1) local law provides an "alternative enforcement mechanism", and (2) the Trusteeship Agreement does not specifically prohibit wage discrimination in Trust Territory government employment. The Court rejects this argument in Part IV-C-2.

The Court rules that it has subject matter jurisdiction and holds that the Trust Territory government and the High Commissioner are federal agencies for purposes of Trusteeship Agreement analysis. It accordingly denies dismissal as to plaintiffs' claims against those defendants. Since material factual issues exist concerning these claims, the Court also denies summary

440

judgment. The First Amended Complaint fails to sufficiently establish a statutory basis for jurisdiction over monetary claims against the United States and the Interior defendants. As to these three defendants, the Court accordingly dismisses plaintiffs' monetary claims and denies dismissal and summary judgment on these non-monetary claims.

> A. People of Saipan's Comity
> Doctrine and the Covenant's
> Elimination of High Court
> Jurisdiction in the NMI
> Over Actions Filed On or
> After January 9, 1978

Approximately two years before Congress approved the Covenant and created this Court, the Ninth Circuit declared in People of Saipan that as a matter of comity litigants should initially assert Trusteeship Agreement claims in the High Court in cases challenging the High Commissioner's actions as territorial chief executive (the comity doctrine). 502 F.2d at 99. Citing that statement, defendants argue that the Court presently lacks subject matter jurisdiction.

The Court disagrees. Congress and the people of the NMI have dramatically and permanently altered the repose of governmental power and other circumstances which existed when People of Saipan announced the comity doctrine. By fundamentally reconstituting judicial authority in the NMI, the Covenant's judiciary provisions, as implemented by federal legislation and the NMI Constitution, implicitly[34/] eliminated High Court jurisdiction over actions , such as this one, which are filed on or after January 9, 1978, the NMI's Constitution effective date. Because

the High Court has no jurisdiction to which the Court may defer on comity grounds, People of Saipan does not preclude the immediate exercise of jurisdiction.

1. The Covenant and Its Implementation

Covenant 402(a) and 48 U.S.C. § 1694(a)[35]/ give the Court the federal jurisdiction of an Article III district court.[36]/ The concept of federalism allows local courts to exercise concurrent jurisdiction over federal causes if concurrent jurisdiction is neither expressly foreclosed nor incompatible with federal court jurisdiction. Charles Dowd Box Co. v. Courtney. 368 U.S. 502, 508, 82 S.Ct. 519, 523, 7 L.Ed.2d 483 (1962). The Covenant and the NMI Constitution plainly contemplate this coexistence between United States courts and courts of the NMI.[37]/

Defendants apparently believe that this intent also encompasses the High Court. The Trust Territory and the High Commissioner admit in their Answer to the First Amended Complaint that on January 9, 1978 the Covenant and the NMI Constitution superceded the Trust Territory government's secretarially delegated authority. Neither these defendants, the United States nor the Interior defendants identify the purported legal source of High Court jurisdiction over actions filed in the NMI after that date. Covenant 505 provides for the limited continuity of Trust Territory laws.[38]/ Defendants apparently reason that § 505 carries over pre-Covenant Trust Territory Code sections which granted exclusive or original jurisdiction to the High Court in actions against the Trust Territory government.

442

This outwardly plausible rationale ignores the full text of § 505. Section 505 incorporates pre-Covenant laws only to the extent that the laws are consistent with applicable federal laws and treaties, and subsequent action by the NMI government. The question thus becomes whether High Court jurisdiction is consistent with the policies which subsist the judiciary provisions in the Covenant and the NMI Constitution. With respect to actions filed on or after January 9, 1978, the answer to the question is no.

Construction of the Covenant must comport with the guiding principle that "circumstances not plainly covered by the terms of a statute[39/] are subsumed by the underlying policies to which Congress was committed." Rose v. Lundy, ___ U.S. ___, ___; 102 S.Ct. 1198, 1203, 71 L.Ed.2d 379 (1982); accord, Watt v. Alaska, ___ U.S. ___, ___ and n.9, 101 S.Ct. 1673, 1677 and n.9, 68 L.Ed.2d 80 (1981). Courts accordingly must "give statutory language that meaning which nurtures the policies underlying the legislation." ___ U.S. at ___, 102 S.Ct. at 1202; see. e.g., United States v. Mehrmanesh, 689 F.2d 822, 828-830 (9th Cir. 1982); United States v. Smith, 683 F.2d 1236, 1238-1240 (9th Cir. 1982)(en banc).

The Covenant's legislative history and implementation demonstrate that the purpose of its judiciary provisions was to reconstitute judicial authority in the NMI. The joint report of the Senate Foreign Relations and Armed Services Committees[40/] reflects Congress' intention that judicial authority would "be

443

divided between the judiciary established by the Marianas Consti-
tution and a District Court which will be part of the same U.S.
judicial circuit as Guam." S.Rep.No. 596, supra, at 5, reprinted
in 1976 USCAN at 453 (emphasis added). The Court finds no express
or implicit provision in the Covenant's legislative history[41]
for the sharing of jurisdiction with the High Court, which is
created and staffed by the Interior Secretary. Both Congress and
the NMI's negotiators clearly understood that the local non-
federal courts functioning after the Covenant's implementation
would be courts established by the NMI's Constitution and laws
pursuant to Covenant § 203(d). See S.Rep.No. 433, supra, at 70;
H.R.Rep.No. 364, 94th Cong. 1st Sess. 6 (1975); Marianas Political
Status Commission, Section-By-Section Analysis of the Covenant to
Establish a Commonwealth of the Northern Mariana Islands 26 (1975)
(MPSC Analysis), reprinted in Hearing on S.J.Res. 107 Before the
United States Senate Committee on Interior and Insular Affairs, 94th
Cong. 1st Sess. 384 (1975)(Senate Interior and Insular Affairs Com-
mittee Hearing on S.J.Res. 107). The agreement to afford the NMI
the unprecedented right to establish and to control its local
court system was a "basic decision" reached early in the Covenant
negotiations. 120 Cong.Rec. 18266 (1974)(remarks of Senator Fong
and appended communique). Moreover, one of the major objectives
of Micronesians from the commencement of joint status negotiations
in 1969 was to obtain access to United States appellate courts.
S.Rep.No. 433, supra at 43. The Covenant has secured that access
for the people of the NMI. See Camacho v. Civil Service Commission,
666 F.2d 1257, 1259-1262 (9th Cir. 1982).

444

The continued jurisdiction of the High Court in the NMI is incompatible with the permanent judicial system designed by the Covenant. It is not established by the Constitution or laws of the NMI. It is an Interior Department creation from which there is no federal appeal.[42/] Its justices are appointed by and removable by the Interior Secretary, and thus lack the independence and local accountability which distinguish the commonwealth judiciary structured by the NMI Constitution pursuant to the Covenant. See King v. Morton, 520 F.2d 1140, 1159 and n.17, 1160 (D.C.Cir. 1975)(Tamm, Circuit Judge, dissenting)(noting a lack of independence in the Interior-appointed High Court of American Samoa). Pursuant to Covenant § 203(d), the NMI Constitution Transitional Matters Schedule gives the High Court a degree of modest and carefully restricted authority. Under § 4 of the Transitional Matters Schedule, the High Court retains jurisdiction only over causes arising under local law which were pending before the High Court on the NMI Constitution's effective date.[43/] Section 4's enactment history reveals the NMI Constitutional Convention considered and rejected the option of expanding the High Court's narrow § 4 authority in the event a federal district court was not functioning by the time the NMI Constitution became operative.[44/] The Ninth Circuit's analysis of the status of this Court's appellate division extends with equal force to the High Court's temporary and limited role under § 4: The High Court "does not become transmuted into a court of the NMI merely because the NMI granted some discretion it could have withheld." 666 F.2d at

1261. It follows that when the NMI Constitution took effect on
January 9, 1978, the High Court lost jurisdiction over any actions
filed in the NMI on or after that date, including actions against
the Trust Territory government or the High Commissioner.

### 2. 48 U.S.C. § 1681(a)

An analysis of the Covenant's federal judiciary
provisions and 48 U.S.C. § 1694a in light of 48 U.S.C. § 1681(a)
confirms this conclusion. Section 1681(a) states:

> Until Congress shall further provide
> for the government of the Trust
> Territory of the Pacific Islands,
> all executive, legislative, and
> judicial authority necessary for
> the civil administration of the
> Trust Territory shall continue to
> be vested in such person or persons
> and shall be exercised in such
> manner and through such agency or
> agencies as the President of the
> United States may direct or autho-
> rize.

In Sablan Construction Co. v. Trust Territory, this
Court's appellate division examined the interrelationship between
§ 1681(a), Covenant § 402(b) and 48 U.S.C. § 1694a(b).[45/]

///

///

///

///

///

///

///

Sablan Construction's reasoning concerning the Covenant's reconstitution of jurisdiction over local law actions in the NMI also extends to federal jurisdiction over the Trust Territory under Covenant § 402(a) and 48 U.S.C. § 1694(a).

One jurisdictional issue in Sablan Construction[46/] was whether § 402(b) and § 1694a(b) give jurisdiction to the District Court's trial division over a tax refund suit under local law against the Trust Territory. Citing a pre-Covenant Trust Territory Code section, the Trust Territory asserted that High Court had exclusive jurisdiction. The appellate division rejected that argument and ruled that the trial division properly exercised jurisdiction. Id.. It held that § 402(b) and § 1694a(b), as construed in light of § 1681(a), displace the High Court's exclusive jurisdiction over actions arising within the NMI. Id. at 141.

Like the governments of territories and possessions under United States sovereignty, the Trust Territory government of which the High Court is part is "created pursuant to the authority of Congress." Sablan Construction accurately characterized the High Court's judicial power as delegated United States authority emanating from Congress.[47/] 526 F.Supp. at 139. As the Ninth Circuit stated with respect to the High Commissioner, the High Court's authority "does not come from the people of the Trust Territory." 502 F.2d at 98 n.10. Therefore, under § 1681(a) the High Court could retain the judicial power administratively granted by the Interior Secretary only until Congress expressly or implicitly reposed that power elsewhere.

447

As _Sablan Construction_ concluded, Congress did exactly that by approving the Covenant's conferral of judicial authority upon the federal court and upon local courts created or specified by NMI law. The purpose of § 1681(a) was to authorize the interim continuance of the Trust Territory government created by the Interior Secretary until Congress enacted pending organic legislation. _See_ H.R.Rep.No. 1767, 83d Cong. 2d Sess. 2 (1954); S.Rep. No. 371, 83d Cong. 1st Sess. 2 (1953), _reprinted_ _in_ 99 Cong.Rec. 6414-6415 (1953).[48/] Although Congress never passed the bills which were introduced in 1953, its approval of the Covenant in 1976 represented the very sort of supervening congressional action contemplated by § 1681(a).

The Covenant represents the United States' fulfillment of its obligation under the Trusteeship Agreement to develop and to grant self-government or independence in the NMI in accordance with the wishes of the NMI's people. _See_, _e.g._, S.Rep.No. 433, _supra_ at 23. Like the _Sablan Construction_ court, this Court finds it contextually significant that the Covenant mandated the realignment of judicial authority well before the termination of the trusteeship. 526 F.Supp. at 139 and n.13. This fact assumes even greater importance when viewed within the historical background of Micronesian pursuit of federal court access. S.Rep.No. 433, _supra_, at 43. The legislative history of both the Covenant and the NMI Constitution reveals that the elimination of the pre-Covenant judicial system is an objective which is vital to the Covenant's spirit.

448

The Court accordingly rejects the argument that Covenant § 505 implicitly preserves High Court jurisdiction. The continued presence of the Trust Territory Government in the Northern Mariana Islands presents an unanticipated situation not addressed by the framers of the Covenant and the Constitution. Therefore, the Court must look to the fundamental policies embodied in the Covenant and in the Constitution regarding judicial authority in reaching a decision on this issue. Rose, ___ U.S. at ___, 102 S.Ct. at 1203. Based on these considerations the Court is of the opinion that defendants' construction of § 505 would frustrate rather than nurture the fundamental policies regarding judicial authority. If Congress and the NMI's people had intended not to eliminate the High Court's NMI jurisdiction over actions filed on or after January 9, 1978, the Covenant or the NMI Constitution logically would have reflected that desire either in plain language, in the legislative history, or by delaying the investiture of jurisdiction in the new federal and NMI courts. See 526 F.Supp. at 139. Neither the Covenant nor the NMI Constitution manifests that intention. To adopt defendants' jurisdictional analysis would be to impute to the framers of those documents the intention to indeterminately perpetuate the very federally unreviewable and locally unaccountable judicial apparatus which the framers chose to discard. This is an absurd construction which the Court must avoid. United States v. Turkette, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981); Melong v. Micronesian Claims Commission, 569 F.2d 630, 634 (D.C.Cir. 1977). The Court holds that when the NMI Constitution took effect on January 9, 1978, the High Court lost jurisdiction over any actions filed in the NMI on or after that date, including actions against the Trust Territory government.[49/]

### 3. Conclusion

For the reasons discussed above, People of Saipan no longer prevents the exercise of jurisdiction over Trusteeship Agreement claims which have been initially asserted in the High Court. Although district courts should not prematurely anticipate the judicial invalidation of circuit precedent,[50] they must respect and enforce supervening congressional enactments such as the Covenant. It is preeminently a judicial duty to perceive the impact of legislation upon pre-existing case law principles. Moragne v. States Marine Lines, 398 U.S. 375, 392, 90 S.Ct. 1772, 1783, 26 L.Ed.2d 339 (1970); Normile v. Maritime Co. of the Philippines, 643 F.2d 1380, 1382 and n.3 (9th Cir. 1981).

Fulfilling that responsibility, the Court concludes that the policies embodied in the Covenant's judiciary provisions supersede People of Saipan's comity doctrine. The deferral of jurisdiction on comity grounds necessarily presumes the existence of concurrent jurisdiction in the court deferred to. See, e.g., Rose, ___ U.S. at ___, 102 S.Ct. at 1203; Fay v. Noia, 372 U.S. 391, 420, 83 S.Ct. 822, 838, 9 L.Ed.2d 837 (1963). By terminating the High Court's NMI jurisdiction, the Covenant nullified the basic premise underlying People of Saipan's comity doctrine. The Court's recognition that it may exercise jurisdiction effectuates People of Saipan's paramount objective. That objective is to ensure that Micronesians have "a forum which can hear their claim that the High Commissioner has violated the duties assumed by the United States in the Trusteeship Agreement." 502 F.2d at 100.

450

B. The Federal Agency Status of the Trust
Territory Government and the High
Commissioner For Purposes of Determining
Liability For Trusteeship Agreement
Violations

The United States and the Interior defendants maintain
that they cannot be held liable for Trusteeship Agreement violations
by the Trust Territory government because the Trust Territory
government is not a federal agency. Plaintiffs respond with the
equally sweeping assertion that Trust Territory government
employees are necessarily United States government employees due
to the congressional, presidential and secretarial delegation
through which the Trust Territory government derives its authority.
While the Court rejects plaintiffs' syllogism, it holds that the
Trust Territory government and the High Commissioner are agencies
of the United States under 48 U.S.C. § 1681(a) and therefore must
be considered federal agencies for purposes of determining
liability for Trusteeship Agreement violations.

Like other territorial governments under United States
jurisdiction, [51/] the Trust Territory government operates, as a
practical matter, as a subordinate and inchoately separate entity
in relation to the United States government. The Interior Depart-
ment's stated policy has been to minimize the exercise of its
delegated governmental authority in order to facilitate decentra-
lized decision-making by territorial governments. See generally
R. Van Cleve, The Office of Territorial Affairs 144-149 (1974)
(discussing the Interior Department's policy of encouraging
territorial autonomy notwithstanding the legal status of appointed

chief executives such as the High Commissioner as "subordinates of the Secretary of the Interior").[52/] As a result of this policy, the Trust Territory government, like other territorial governments, functions as an entity which is administratively distinct from the United States government even though it ultimately is "created pursuant to the authority of Congress." People of Saipan, 502 F.2d at 95. For this reason, the Court cannot concur in plaintiffs' view that Trust Territory government employees necessarily are federal government employees.

On the other hand, it does not follow that the Trust Territory government is not a federal agency for purposes of Trusteeship Agreement analysis merely because the Interior Department permits it to function with a degree of autonomy.[53/] A territorial government's status as a federal agency invariably turns upon the factual and legal context of reference. A territorial government may be a federal agency in some legal contexts and a non-agency in others. Compare United States v. Wheeler, 435 U.S. 313, 321 and nn.16-17, 98 S.Ct. 1079, 1085 and nn.16-17, 55 L.Ed.2d 303 (1978)(dictum characterizing territorial governments created under congressional authority as federal agencies for purposes of federal constitutional double jeopardy analysis) and Government of the Virgin Islands v. Christensen, 673 F.2d 713, 716 (3d Cir. 1982)(relying upon Wheeler's "federal agency" analysis in holding that 28 U.S.C. § 1291 authorizes criminal appeals by the Government of the Virgin Islands) with Harris v. Boreham 233 F.2d 110, 113-116 (3d Cir. 1956)(holding that for purposes of the

Federal Tort Claims Act a Virgin Islands Municipality and one of its Interior-appointed officials are not "federal agencies").

Defendants' argument overlooks the language of 48 U.S.C. § 1681(a) and the Interior Department secretarial order which defines the Trust Territory government's authority. Trusteeship Agreement Article 3 grants the United States "full powers of administration, legislation and jurisdiction" subject to the specific obligations imposed by the agreement. See note 19, supra. Title 48 U.S.C. § 1681(a) instructs that the United States' powers shall be exercised by "such agency or agencies as the President may direct or authorize" until Congress provides otherwise. See p. 21, supra. The Interior Secretary obtained § 1681(a) authority pursuant to presidential delegation[54] and re-delegated it to the Trust Territory government. E.g., Interior Department Secretarial Order No. 3039, 44 Fed.Reg. 28116 (1979). Because the Trust Territory government's authority does not emanate from the Trust Territory's people,[55] it cannot trace its legitimacy to the right of self-government which is implicit in Trusteeship Agreement Article 6.1 and manifested in the constitutions of the NMI and the emerging Micronesian free associated nations. Therefore, if the Trust Territory government is not a § 1681(a) agency of the United States for purposes of Trusteeship Agreement analysis, it is without legal authority to govern.

The Trust Territory High Court itself has recognized that the Trust Territory government is a § 1681(a) federal agency:

///

> The Trust Territory of the Pacific Islands
> appears to be quite definitely of a dual
> nature. It certainly is the means by which
> the United States carries out the major part
> of its responsibilities as administering
> authority under the Trusteeship agreement...
> Furthermore, the Trust Territory Government
> seems clearly intended to come within the
> meaning of the words "such agency or agencies
> as the President of the United States may
> direct or authorize" as used in 48 U.S.C.
> § 1681(a) in providing for the government of
> the area. The Trust Territory appears to act
> sometimes as a part of the Department of the
> Interior and sometimes as a separate, though
> subordinate, body having a will of its own.

Alig v. Trust Territory of the Pacific Islands, 3 T.T.R. 603, 612-613 (H.C.App.Div. 1967). See also Castro v. United States, 500 F.2d 436, 437 (Ct.Cl. 1974)("the Government of the Trust Territory of the Pacific Islands, administer[s] Saipan under a delegation to the United States from the United Nations...") (emphasis added). Secretarial Order 3039 is the most recent Interior Department regulation from which the Trust Territory government derives its authority. Section 3 of Order 3039 identifies governmental functions which 'are retained by the United States" (emphasis added). Subsection 3.a provides in pertinent part:

> The High Commissioner of the Trust Territory
> of the Pacific Islands, under the general
> supervisory authority of the Secretary, shall
> continue to exercise all authority necessary
> to carry out the obligations and responsibi-
> lities of the United States under the 1947
> Trusteeship Agreement, in order to insure
> that no action are [sic] taken that would be
> inconsistent with the provisions of such
> Trusteeship Agreement, this Order, and with
> existing treaties, laws, regulations, and
> agreements generally applicable in the Trust
> Territory of the Pacific Islands (emphasis added).

454

One of the functions expressly reserved to the United States through the High Commissioner is the power under § 3.a(8) to staff the Trust Territory government. Subsection 3.a(8) was the primary authority invoked by the High Commissioner when promulgating the pay scales which plaintiffs challenge. See note 3, supra. Given the language of § 1681(a) and Order 3039 § 3.a, it requires a contortion of logic to avoid the conclusion that the Trust Territory government and the High Commissioner are federal agencies for purposes of Trusteeship Agreement analysis.

Although courts have determined that the Trust Territory government is not a "federal agency" for purposes of certain statutes or general government contracting, defendants do not cite nor has the Court discovered any authority indicating that the Trust Territory government is not a federal agency for purposes of fulfilling the United States' Trusteeship Agreement obligations. Only two of the cases upon which defendants rely are binding on this Court.[56/] In both decisions the Ninth Circuit carefully confined its holdings to the statutes presented. McComish v. Commissioner of Internal Revenue, 580 F.2d 1323, 1328 (9th Cir. 1978) held that "the Trust Territory is not an agency of the United States for purposes of § 911(a)(2) of the Internal Revenue Code" (emphasis added). In People of Saipan the Ninth Circuit ruled that "neither the Trust Territory government nor the High Commissioner is a 'federal agency' as that term is used in making actions reviewable under the... [Administrative Procedure Act or the National Environmental Policy Act]". 502 F.2d at 96 (emphasis

added). The court recognized that the words "federal agency" are not technical terms of art, but words which vary in meaning with the statutory context in which they appear. See id. at 95 (distinguishing prior decisions which involved the construction of income taxation statutes and the Portal-to-Portal Act of 1947). As explained by a court which construed the Freedom of Information Act:

> [A]ny definition [of the term agency] can be of only limited utility to a court confronted with one of the myriad organizational arrangements for getting the business of the government done... The unavoidable fact is that each new arrangement must be examined anew and in its own context.

Public Citizen Health Research Group v. Department of Health, Education and Welfare, 668 F.2d 537, 542 (D.C.Cir. 1981). See also Lewis v. United States, 680 F.2d 1239, 1242-1243 (9th Cir. 1982)(holding that Federal Reserve Banks are not federal agencies for purposes of the Federal Tort Claims Act and noting that Reserve Banks and their employees have properly been held to be federal instrumentalities for purposes of other statutes).

The rationale underlying the Ninth Circuit's holdings in People of Saipan implicitly acknowledged that the High Commissioner is a federal agency for purposes of fulfilling the United States' Trusteeship Agreement obligations. The district court ruled that the High Commissioner was exempt from Administrative Procedure Act review under a statutory exception for the governments of the United States territories or possessions. As an integral part of

its reasoning, the district court otherwise accepted the argument that, "under general principles of agency law and court decisions defining the term 'federal agency', the High Commissioner and his immediate subordinates in the executive branch of the Trust Territory Government are federal officials operating as a component of the Department of the Interior." 356 F.Supp at 657 (emphasis added). The page in the district court's opinion which contained the quoted language was among those which the Ninth Circuit cited in affirming the district court's conclusions. See 502 F.2d at 95. The Ninth Circuit specifically held that "because of the process of his appointment, the High Commissioner has the responsibility to act in a manner consistent with the duties assumed by the United States itself in the Trusteeship Agreement." Id. at 98. It also cited with apparent approval an Italian court decision which held that Italy's Trusteeship Administrator for Somoliland was an organ of the Italian state because he derived his authority from that state. Id. at 98 n.10. By deciding that appointment by the President and confirmation by the Senate require the High Commissioner to comply with the Trusteeship Agreement, the Ninth Circuit also necessarily concluded that the High Commissioner is a federal agency for purposes of Trusteeship Agreement analysis, notwithstanding the High Commissioner's non-agency status under the Administrative Procedure Act.

Defendants observe that courts have described the Trust Territory government as a "quasi-sovereign"[57]/or "qualified sovereign"[58]/entity. Defendants apparently reason that these state-

ments uniquely establish the Trust Territory government as an independent international entity which is so removed from United States control that it cannot be considered a federal agency for any purpose.

Defendants misconceive both the nature and the source of the Trust Territory government's authority. Sovereignty is an elusive concept[59]/which the United States Supreme Court has characterized as "the right to govern." Nevada v. Hall, 441 U.S. 410, 415, 99 S.Ct. 1182, 1185, 59 L.Ed.2d 416, reh.denied 441 U.S. 917, 99 S.Ct. 2018, 60 L.Ed.2d 389 (1979), quoting Chisholm v. Georgia, 1 U.S. (2 Dall) 419, 472, 1 L.Ed. 440, 463 (1793). The Trust Territory government is not created by the United Nations nor does its "right to govern" come from the Trust Territory's people. Although judicial acceptance of the geographic area of the Trust Territory as "foreign" has varied according to the facts and statutes presented,[60]/the Ninth Circuit and this Court have uniformly rejected the Trust Territory government's claims of foreign state immunity from suit in United States courts. See People of Saipan, 502 F.2d at 94-95, affirming 356 F.Supp. at 655-656; Sablan Construction, 526 F.Supp. at 137-138. See also Sablan Construction, 526 F.Supp. at 141; World Communications Corp. v. Micronesian Telecommunications Corp., 456 F.Supp. 1122, 1124 (D.Haw. 1978); McNeill, supra, at 446-450, 469-470 (concluding that the Trust Territory lacks independent international legal personality). McComish proffered in dictum that "[b]ecause the Trust Territory is a trusteeship the United States cannot dissolve

it as an entity or change its status without the consent of the Trusteeship Council." 580 F.2d at 1330. Within two months after the Ninth Circuit decided McComish, the United States demonstrated that it has the plenary power to dissolve the Trust Territory government. Through the issuance of Secretarial Order 3027, the Interior Secretary summarily eliminated the Congress of Micronesia, which was the only branch of the Trust Territory government ever chosen by the area's people rather than by the United States.61/ See Part III, supra. The Trust Territory government's structure and functions are "virtually identical to [those of governments in] the territories and possessions in which the United States is sovereign," and it is subject to "a similar kind of control and supervision from the United States." Gale v. Andrus 643 F.2d 826, 832-833 (D.C.Cir. 1980). When reduced to its essence, the Trust Territory government's limited sovereignty is merely "the right to exercise local governmental authority delegated by the United States Congress pursuant to its legislative powers under the Trusteeship Agreement." Sablan Construction, 526 F.Supp. at 140 (citations omitted). The terms "qualified sovereign" and "quasi-sovereign" do not uniquely apply to the Trust Territory government. They are descriptions which courts generally employ to signify the separate but subordinate status of territorial governments exercising congressionally delegated authority. See, e.g., People of Puerto Rico v. Shell Oil Co., 302 U.S. 253, 262, 58 S.Ct. 167, 171, 82 L.Ed. 235 (1937)(stating that Puerto Rico's former territorial status conferred "quasi-sovereignty" similar to that possessed

by states); Harris v. Municipality of St. Thomas & St. John, 212 F.2d 323, 325-327 (3d Cir. 1954)(describing Virgin Islands municipal governments as "subordinate bodies politic" with state-like attributes of "quasi-sovereignty" or "qualified sovereignty").[62]

The Court accordingly decides that, because the Trust Territory government and the High Commissioner are federal agencies under 48 U.S.C. § 1681(a), they necessarily are federal agencies for purposes of determining liability for Trusteeship Agreement violations.

### C. Rulings on the Motions

#### 1. The Trust Territory Government and the High Commissioner

The Court concludes that it has subject matter jurisdiction over plaintiffs' monetary and non-monetary Trusteeship Agreement claims against the Trust Territory government and the High Commissioner. A claim "arises under" a treaty for purposes of federal question jurisdiction under 28 U.S.C. § 1331 if the claim asserts a right created by treaty and the construction of a treaty will determine the claim's disposition. Skokomish Indian Tribe v. France, 269 F.2d 555, 558 (9th Cir. 1959); see Buechold v. Ortiz, 401 F.2d 371, 372 (9th Cir. 1968). Congress intended this Court's federal question jurisdiction under 48 U.S.C. § 1694a(a) to be coextensive with § 1331 jurisdiction. See S.Rep.No. 433, supra, at 72.[63] The Trusteeship Agreement creates the rights which plaintiffs seek to enforce and its construction will determine whether

the Trust Territory government and the High Commissioner have violated those rights. Because plaintiffs' Trusteeship Agreement claims assert rights under a United States treaty,[64/] the claims "arise under" a treaty for purposes of § 1694a(a) jurisdiction against those defendants.

Although the Trust Territory government is a federal agency for purposes of Trusteeship Agreement liability analysis, jurisdiction over plaintiffs' monetary claims against the Trust Territory government is not impaired by the presence of jurisdictional obstacles to suit against the United States itself. Like other territorial governments exercising delegated congressional authority, the Trust Territory government is a subordinate and administratively separate entity in relation to the United States government.[65/] Its common law immunity from suit[66/] neither insulates it from actions alleging violations of federal law[67/] nor extends into another government's courts. See Nevada v. Hall, 441 U.S. at 414-416, 99 S.Ct. at 1185-1186.

When the Supreme Court clarified the limits of the government immunity doctrine in Nevada v. Hall, it noted that the basis for the doctrine is "'the logical and practical ground that there can be no legal right as against the authority that makes the law upon which the right depends'". Id. at 415-416, quoting Kawananakoa v. Polyblank, 205 U.S. 349, 353, 27 S.Ct. 526, 527, 51 L.Ed. 834 (1907).[68/] The Trust Territory government is not the authority which "made" or created the Trusteeship Agreement. The sole reason for its existence is to fulfill that instrument's

461

specific legal obligations. "Like [in] all trusts... the authority of the trustee is never any greater than that with which it was endowed by the trust agreement." Gale v. Andrus, 643 F.2d 826, 830 (D.C.Cir. 1980). Trusteeship Agreement Article 3 embodies this principle. The administering authority's governmental power under Article 3 as expressly limited by the obligations imposed by other articles in the agreement. See note 19, supra. Thus, there is no logical ground for immunizing the Trust Territory government from accountability in this Court for alleged Trusteeship Agreement violations. Whatever may have been the analytical relevance of "practical" considerations as a basis for immunity in Kawananakoa, they cannot prevail over the interest in protecting internationally created and federally enacted Trusteeship Agreement rights. In People of Saipan, Judge King emphasized the Kawananakoa court's qualifying observation that "'the rights [under consideration] are not created by Congress or the Constitution, except to the extent of certain limitations of power.'" 356 F.Supp. at 659, quoting 205 U.S. at 354-355, 27 S.Ct. at 527. The Ninth Circuit subsequently characterized the Trusteeship Agreement as a "basic constitutional document." 502 F.2d at 98. Within the context of federal constitutional construction, the Supreme Court has reaffirmed that: "[t]he concept that the Bill of Rights and other constitutional protections against arbitrary government are inoperative when they become inconvenient or when expediency dictates otherwise is a very dangerous doctrine and if allowed to flourish would destroy the benefit of a written Constitution and

462

undermine the basis of our government." Reid v. Covert, 354 U.S. 1, 14, 77 S.Ct. 1222, 1229, 1 L.Ed.2d 1148 (1957)(plurality). By parity of reasoning, considerations of government expediency cannot predominate over the commands of the Trusteeship Agreement. In the paraphrased words of Justice Blackmun, to conclude otherwise would reduce the Trusteeship Agreement to "politically self-serving but essentially meaningless language about what the... [Trust Territory's people] deserve at the hands of... [the administering] authorities." Pennhurst State School v. Halderman, 451 U.S. 1, 32, 101 S.Ct. 1531, 1547, 67 L.Ed.2d 694 (1981)(concurring in part and concurring in the judgment).

The Court accordingly denies the dismissal motions by the Trust Territory government and the High Commissioner. Because the record discloses unresolved material factual issues, the Court also denies summary judgment. No Oilport v. Carter, 520 F.Supp. 334, 373 (W.D. Wash. 1981).

 2. The United States, The Interior
 Department and the Interior
 Secretary

The United States and the Interior defendants move for dismissal on the additional ground that the Trusteeship Agreement does not confer judicially enforceable rights against pay scale discrimination. Defendants primarily base this argument upon the following statement by the Ninth Circuit in People of Saipan:

 The extent to which an international
 agreement establishes affirmative and
 judicially enforceable obligations without
 implementing legislation must be determined

463

> in each case by reference to many contextual
> factors: the purposes of the treaty and the
> objectives of its creators, the existence
> of domestic procedures and institutions
> appropriate for direct implementation, the
> availability and feasibility of alternative
> enforcement methods, and the immediate and
> long-range social consequences of self- or
> non-self-execution.

502 F.2d at 97 (citation omitted). Defendants contend that local laws provide "alternative enforcement methods" within the meaning of the statement above.

Defendants have misinterpreted People of Saipan's analysis. The "alternative enforcement mechanisms" to which the court referred were alternative international forums. As reflected in the paragraph of the People of Saipan opinion immediately preceding the section quoted above, the court was rejecting defendants' argument that a sufficient enforcement mechanism exists in the United Nations Security Council, where the United States possesses veto power. See id. and n.9. The court did not suggest that a Trusteeship Agreement right is judicially unenforceable when the alleged illegal action by the United States or its Trust Territory government also potentially violates other federal laws or local laws. It merely applied a test developed by scholarly commentary for determining whether an international agreement is judicially enforceable at all as United States domestic law. Because the People of Saipan definitively resolved that threshold question, the formulation quoted is not the relevant inquiry here.

///
///

Defendants also maintain that this case is distinguish-able from People of Saipan and that therefore People of Saipan's recognition of the Trusteeship Agreement's judicial enforceability is inapplicable. In People of Saipan, the plaintiffs sought to enforce the United States' explicit obligations under Trusteeship Agreement Article 6.2 to "regulate the use of natural resources." and to "protect the [Trust Territory's] inhabitants against the loss of their lands and resources." Defendants reason that the Trusteeship Agreement does not afford protection against pay scale discrimination in Trust Territory government employment because Article 6.3's non-discrimination guarantee[69] contains no express provision to that effect.

Defendants overlook the purposive approach to treaty construction articulated by the Supreme Court for the enforcement of treaties as domestic law.[70] The issue is not whether pay scale discrimination is explicitly prohibited or mentioned in the Trusteeship Agreement. The issue is whether pay scale discrimi-nation is incompatible with the Trusteeship Agreement's purposes and objectives. The interpretation of a treaty begins with its language. The clear import of treaty language controls unless its application effects a result inconsistent with the intent of its signatories. Sumitomo Shoji America, Inc. v. Avagliano, ___ U.S. ___, ___, 102 S.Ct. 2374, 2377, 72 L.Ed.2d 365 (1982). A court's most fundamental duty in construing a treaty is to "give effect to the purpose that animates it." Bacardi Corp. of America v. Domenech, 311 U.S. 150, 163, 61 S.Ct. 219, 226, 85 L.Ed. 98

(1940). Purposive construction requires a court to interpret a treaty in a broad and liberal manner. When two constructions of a treaty are possible, one restrictive of rights that may be claimed under it, and the other favorable to them, the latter is to be preferred. Asakura v. Seattle, 265 U.S. 332, 342, 44 S.Ct. 516, 68 L.Ed. 1041 (1924); accord; Kolovrat et al. v. Oregon, 366 U.S. 187, 192, 81 S.Ct. 922, 925, 6 L.Ed.2d 218 (1961); Bacardi Corp., 311 U.S. at 163, 61 S.Ct. at 226. A treaty must be construed in light of its entire language and history with a view to giving fair operation to the whole. Kolovrat, 366 U.S. at 192, 81 S.Ct. at 925. Sullivan v. Kidd, 254 U.S. 433, 439, 41 S.Ct. 158, 161, 65 L.Ed. 344 (1921). A treaty is essentially a contract between its signatories. State of Washington v. Washington State Commercial Passenger Fishing Vessel Assoc., 443 U.S. 653, 675, 99 S.Ct. 3055, 3069, 61 L.Ed.2d 823 (1979).[71/] A court accordingly construes it under the principles which govern the interpretation of contracts between individuals in order to effectuate the treaty's purposes. Sullivan, 254 U.S. at 439, 41 S.Ct. at 161. Because the Trusteeship Agreement was drafted by the United States and approved by the Security Council without substantial amendment,[72/] under settled contract construction principles ambiguities in the instrument must be construed against the United States and the other defendants in this proceeding. E.g., Restatement, Second, Contracts § 206 (1981).[73/]

 The question of whether defendants have violated the Trusteeship Agreement ultimately will be resolved by examining

the instrument as a whole in light of its purposes and legislative history, rather than by looking solely at Article 6.3. In addition, the Court will seek interpretive guidance and parallels in other areas of domestic law and in "relevant principles of international law... which have achieved a substantial degree of codification and consensus." People of Saipan, 502 F.2d at 99. The Court rejects defendants' mechanical interpretive approach.

The Court also finds no merit in the argument that the United States and the Interior defendants are free from Trusteeship Agreement liability merely because it was the High Commissioner who promulgated the disputed pay scales. Throughout this proceeding, defendants have vigorously asserted that they are trustees in relation to the Trust Territory's people. Defendants also correctly maintain that a trustee can properly delegate duties which it would be unreasonable to require the trustee to personally perform. See Restatement, Second, Trusts § 171, comment d (1959). Under correlative fiduciary principles, the trustee must exercise general supervision over the conduct of its delegate, and may be held liable to the beneficiary, if it permits, acquiesces in or fails to compel the redress of acts by the delegate which would constitute a breach of trust if committed by the trustee. See id. § 151, comment k; id. § 225(2). The Interior Department's own regulations therefore properly reflect that the Interior Secretary's delegation of authority does not relieve him of responsibility for action taken pursuant to the delegation. Interior Department

///

Manual 200.1.9, 42 Fed.Reg. 31661 (1977). As a congressional committee has stated, "[Micronesia] is a U.S. Trust Territory, and if the United States has fulfilled its trust to the inhabitants badly, then those responsible for this condition ought to also be responsible for its remedy," S.Rep.No. 223, 90th Cong. 1st Sess. 8 (1967)(amending the Peace Corps Act). Due to the present procedural posture of this case and the absence of full factual development, it would be premature to determine whether or not the United States and the Interior defendants have violated the Trusteeship Agreement. Nevertheless, under the legal doctrines attendant to the United States' admitted position as trustee, defendants cannot evade liability merely because they delegated the performance of their fiduciary duties to the Trust Territory government and the High Commissioner.

### a. Monetary Claims

Although People of Saipan's comity doctrine does not constrain the Court's jurisdiction, a defect in the complaint requires the dismissal of plaintiffs' monetary claims against the United States.[74/] Even when liberally construed, the complaint fails to establish a statutory basis for jurisdiction. Neither 28 U.S.C. § 1331,[75/] 28 U.S.C. § 1343(3) or (4),[76/] nor 48 U.S.C. § 1694a(a)[77/] confers district court jurisdiction over monetary claims against the United States which are founded upon congressional enactments.

///

When interpreted in plaintiffs' favor, the complaint possibly grounds jurisdiction under the Tucker Act.[78/] District courts have Tucker Act jurisdiction in class actions where the aggregate claims exceed $10,000, as they may here, if no individual class member's claim is greater than that amount. Kester v. Campbell, 652 F.2d 13, 15 (9th Cir. 1981), cert.denied ___, U.S. ___, 102 S.Ct. 1008, 71 L.Ed.2d 298 (1982). The record before the Court does not indicate the amount of back pay claimed by any of the prospective representative plaintiffs.

While the Court must construe the complaint in plaintiffs' favor, the policy of generous construction cannot supply essential jurisdictional facts which are not pleaded. The absence of allegations limiting each claim to $10,000 is fatal to Tucker Act jurisdition. Sheehan v. Army and Air Force Exchange Service, 619 F.2d 1132, 1137 n.7 (5th Cir. 1980), rev'd on other grounds 456 U.S. ___, 102 S.Ct. 2118, 72 L.Ed.2d 520 (1982).

The Court also dismisses the monetary claims against the Interior Department and the Interior Secretary. These claims effectively operate against the United States. See Dugan v. Rank, 372 U.S. 609, 621, 83 S.Ct. 999, 1007, 10 L.Ed.2d 15 (1963). As explained above, plaintiffs have not successfully invoked Tucker Act jurisdiction over the United States. Even if plaintiffs had done so, the dismissal of the Interior defendants would still be required. The only proper Tucker Act defendant is the United States. Bauer v. McCoy, CV 81-19, Decision at 15 n.27 (D.N.M.I. 1982); cf. Davis v. United States, 667 F.2d 822, 825 (9th Cir.

1982)(Federal Tort Claims Act confers jurisdiction only over the United States and not against individual defendants).

b. Non-Monetary Claims

The Administrative Procedure Act (APA)[79/] permits the exercise of jurisdiction over plaintiffs' claims for injunctive and declaratory relief. Section 702 of the APA[80/] allows non-monetary claims predicated upon the alleged failure of a federal agency or officer to act as required in an official capacity. Rowe v. U.S., 633 F.2d 799, 801 (9th Cir. 1980), cert.denied 451 U.S. 970, 101 S.Ct. 2047, 68 L.Ed.2d 349 (1981). Where a district court lacks jurisdiction over monetary claims against the United States government, it may retain jurisdiction over non-monetary claims if the actual relief granted would not operate only to determine the existence and extent of monetary relief against the United States government. See Cape Fox Corp. v. United States, 646 F.2d 399, 402 (9th Cir. 1981); Rowe, 633 F.2d at 802.[81/] Plaintiffs' injunctive and declaratory claims satisfy these standards.

Construed in plaintiffs' favor, the First Amended Complaint alleges that the United States and the Interior defendants have failed to act as required by the Trusteeship Agreement. Plaintiffs aver that the Trust Territory government has discriminated against them "under the direction and supervision of the Department of the Interior and the United States." First Amended Complaint, Count I, paragraph 13. Plaintiff Manglona's affidavit

and its admissible appendices indicate that during the years 1978, 1979 and 1980 plaintiff repeatedly complained by letter to the High Commissioner and other federal officials about the Trust Territory government's employee pay schedules.[82/] The affidavit further states that the only responses to these complaints which plaintiff received were two letters appended to the affidavit.[83] One of the letters[84/] is from the Director of the Interior Department's former Office of Territorial Affairs.[85/] The letter informs plaintiff that the Interior Department has no jurisdiction over Trust Territory salary schedules. The apparent thrust of plaintiffs' charge is that the Interior Department violated the Trusteeship Agreement by expressly denying plaintiffs' request for corrective intervention against the disputed pay scales. This charge presents a justiciable § 702 claim.

Neither the injunction nor the declaration which plaintiffs seek would constitute a monetary decree against the United States government. Plaintiffs ask the Court to enjoin defendants from "maintaining" or "continuing" the disputed pay scales. With respect to the United States and the Interior defendants, an injunction so framed would effectively require these defendants to supervise the pay scale policies of their delegate the Trust Territory government as allegedly mandated by the Trusteeship Agreement.[86/] In essence, the injunction would require supervisory action "unlawfully withheld or unreasonably delayed" within the meaning of APA § 706(1).[87/] APA § 703 would permit a declaration that the United States and the Interior defendants have violated

471

the Trusteeship Agreement. Section 1694a(a) jurisdiction is not barred by the fact that the declaration might later afford a basis for monetary relief. Laguna Honda Corp. v. Martin, 643 F.2d 1376, 1379 (9th Cir. 1981).[88]/

Finally, the § 706(a)(1) "agency discretion" exception to APA review is unavailable to defendants. Section 706(a)(1) delineates a very narrow exception which covers only those rare instances in which statutes are so broadly drawn that there is no law to apply. Citizens to Preserve Overton Park Inc. v. Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 820-821, 28 L.Ed.2d 136 (1971); Rank v. Nimmo, 677 F.2d 692, 699 (9th Cir. 1982), cert.denied ___ U.S. ___, ___, 103 S.Ct. 210, 74 L.Ed.2d 168 (1982). This is not an instance in which there is no law to apply. As the Ninth Circuit decided in People of Saipan, the Trusteeship Agreement articulates direct and affirmative legal obligations which are not too vague for application and enforcement. 502 F.2d at 97, 100. The Article 6 obligations at issue here are unequivocally stated in mandatory and non-discretionary language.

For these reasons, the Court concludes that it has jurisdiction over plaintiffs' injunctive and declaratory claims. Defendants' dismissal motions are denied. Plaintiffs have yet to prove that defendants' alleged omissions violate the Trusteeship Agreement. The unresolved factual issues which are relevant to this question necessitate the denial of summary judgment. 520 F.Supp. at 373.

///

## V. CIVIL RIGHTS ACTS CLAIMS AGAINST THE TRUST TERRITORY GOVERNMENT AND THE HIGH COMMISSIONER

### A. Introduction

The parties do not dispute the applicability of § 1981, § 1983, Title VI and Title VII in the NMI since January 9, 1978. Under Covenant § 502(a)(2), federal laws which generally apply in the States and in Guam also apply in the NMI unless the Covenant provides otherwise.[89/] Pursuant to the presidential proclamation mandated by Covenant § 1003(b), section 502(a)(2) became effective on January 9, 1978. Section 1981, § 1983, Title VI and Title VII generally apply in the States and in Guam. Since they are not among the laws which the Covenant makes inapplicable,[90/] they have applied in the NMI at least since January 9, 1978.

Plaintiffs contend that, whatever may be the applicability of these civil rights law elsewhere in the Trust Territory,[91/] the laws govern the Trust Territory government's conduct in the NMI. Plaintiffs reason that the laws apply through the operation of § 502(a)(2).

Defendants reply that § 502(a)(2) does not affect the Trust Territory government and that therefore the Trust Territory government and the High Commissioner cannot be sued under § 1981, § 1983, Title VI or Title VII. This argument essentially rests upon two premises.

First, defendants submit that § 502(a)(2) does not manifest congressional intent to apply federal legislation to the Trust Territory government. Neither § 502(a)(2) nor any of the

473

civil rights laws above expressly states that it applies to the Trust Territory government. Defendants state that federal legislation can apply to the Trust Territory government only if Congress specifically includes the Trust Territory within the legislation's coverage. For this proposition defendants cite the District of Columbia Circuit's decision in Gale v. Andrus, 643 F.2d at 833-834.

Second, defendants assert that the Trust Territory government has judicially recognized "qualified" or "quasi" sovereign status as an entity distinct from the United States government. Defendants do not clearly articulate how or why this status insulates the Trust Territory government from the Covenant. Defendants apparently reason that Trust Territory government cannot be affected by Covenant provisions which the United States government negotiated and enacted into law.

The Court rejects defendants' position. Gale does not unequivocally stand for the "specific inclusion" statutory construction theory which defendants advance. To the extent that Gale actually supports that theory, the Court must decline to follow the decision. When statutory language is inconclusive, as it is in Covenant § 502(a)(2), the precedentially substantiated, logical and realistic inquiry is whether the application of federal legislation to the Trust Territory government is consistent with: (1) the manifest purposes and enactment history of the legislation; and (2) the United States' fiduciary obligations to the people of the Trust Territory under the Trustee-

474

ship Agreement. Finally, on the basis of the analysis in Part IV-B, *supra*, the Court rejects defendants' contention that the Trust Territory government's unique but subordinate status exempts it from compliance with federal law. The Trust Territory's qualified and administratively conferred authority derives ultimately from Congress. That authority is not an immunity shield against federal legislation in general or the Covenant in particular. Sablan Construction, 526 F.Supp. at 140.

The Court confronts four questions. Section 1981, Title VI and Title VII are sources of substantive federal rights which § 502(a)(2) confirms as applicable in the NMI. The first question is whether the application of these statutes to the Trust Territory government through § 502(a)(2) is consistent with the purposes and legislative history of the Covenant and with the Trusteeship Agreement. The Court decides that it is. The Court accordingly holds that the Trust Territory government and the High Commissioner may be sued under § 1981, Title VI and Title VII for their actions taken in the NMI on or after January 9, 1978. In contrast to the statutes above, § 1983 is not a source of substantive rights. Chapman v. Houston Welfare Rights Organization, 441 U.S. 600, 618, 99 S.Ct. 1905, 1916, 60 L.Ed.2d 508 (1979). In order to determine whether plaintiffs may maintain their § 1983 claims, it is necessary to look beyond § 502(a)(2) and examine the rights which plaintiffs seek to vindicate as well as § 1983's purposes and legislative history. The rights which plaintiffs seek to enforce under § 1983 are federal constitutional guarantees of due process

475

and equal protection. Thus, the second question is whether those guarantees are restraints against the High Commissioner as territorial chief executive and against the Trust Territory government. The Court answers this question affirmatively. Section 1983 authorizes suits against "persons" who act under color of law of any "State or Territory." The third question thus is whether the Trust Territory is a "Territory" for purposes of § 1983. The fourth question is whether the Trust Territory government and the High Commissioner are suable "persons" under that statute. After analyzing § 1983's purposes and legislative history in light of the Trusteeship Agreement's obligations, the Court also answers the third and fourth questions affirmatively.

For these reasons and others stated below, the Court denies defendants' dismissal and summary judgment motions as to plaintiffs' § 1981 and § 1983 claims. Because the provision of employment is not the primary objective of federal financial assistance to the Trust Territory, 42 U.S.C. § 2000d-3 compels the dismissal of plaintiffs' Title VI claims for lack of subject matter jurisdiction. The Court dismisses plaintiffs' Title VII claims on the same ground for failure to comply with 42 U.S.C. § 2000e-5(e).

///
///
///
///
///

B. § 1981 Claims

1. Jurisdiction: The Applicability of
§ 1981, Title VI and Title VII to
the Trust Territory Government and
the High Commissioner Through the
Operation of Covenant § 502(a)(2)

Title 42 U.S.C. § 1981 provides:

All persons within the jurisdiction
of the United States shall have the same
right in every State and Territory to make
and enforce contracts, to sue, be parties,
give evidence, and to the full and equal
benefit of all laws and proceedings for the
security of persons and property as is
enjoyed by white citizens, and shall be
subject to like punishment, pains, penal-
ties, taxes, licenses, and exactions of
every kind, and to no other.

Because § 1981 has applied in the NMI at least since January 9,
1978, the NMI is a "State" or a "Territory" for purposes of
§ 1981.[92/] There are two analytical steps involved in determining
whether § 1981 applies in the NMI to the Trust Territory government
and the High Commissioner: (1) the identification of the governing
statutory construction principles; and (2) the application of
those construction principles to Covenant § 502(a)(2). The
discussion which follows in Parts V-B-1-a and b also applies to
Title VI and Title VII.

a. Statutory Construction Principles

▮▮▮▮ Under Trusteeship Agreement Article 3, the United States'
powers of administration, legislation and jurisdiction include
the authority to apply federal law to the Trust Territory.[93/]
The parties agree that the application of federal legislation to

477

the Trust Territory must comport with manifest congressional intent. See People of Enewetak v. Laird, 353 F.Supp. at 815.

Their point of disagreement apparently is the meaning of "manifest" intent. Plaintiffs maintain that § 502(a)(2) is an exercise of Article 3 authority which affects the Trust Territory government equally with other persons and entities in the NMI.[94/] Defendants reply that federal legislation cannot apply to the Trust Territory government unless Congress specifically so states in the legislation. Noting the absence of an express reference to the Trust Territory government in § 502, defendants contend that the Trust Territory government is not required to comply either with the civil rights laws invoked by plaintiffs or with other federal legislation implicated by § 502(a)(2).[95/]

Gale v. Andrus is the foundation of this "specific inclusion" argument. In Gale the two-judge majority ostensibly asserted the Trust Territory's "Lack of Specific Statutory Inclusion" in the Freedom of Information Act (FOIA)[96/] as an independent basis for its decision.[97/] 643 F.2d at 833-834. If considered in isolation, both the subject heading of this section of the majority opinion and certain statements in it[98/] support a specific inclusion argument. Yet, a careful examination of the opinion reveals the majority's recognition that federal legislation may apply to the Trust Territory government without an express statement of coverage.

First, the majority stated that "the Trust Territory should not be required to comply with the APA or the FOIA because

neither statute specifically <u>or implicitly</u> covers it." <u>Id.</u> at 833 (emphasis added). This acknowledgment that federal laws can implicitly apply to the Trust Territory government moderates and effectively nullifies <u>Gale</u>'s pronouncements concerning specific inclusion.

Second, the majority cited with apparent approval the statutory construction principles articulated in <u>People of Enewetak</u> v. Laird.[99/] <u>See</u> 643 F.2d at 834. <u>People of Enewetak</u> discredits rather than supports defendants' specific inclusion approach to statutory construction. <u>People of Enewetak</u> ruled that the National Environmental Policy Act (NEPA)[100/] applies in the Trust Territory to activities of federal agencies. Like the language and legislative history of both the FOIA,[101/] and the civil rights statutes presented here, NEPA's language and legislative history lack any express reference to the Trust Territory. 353 F.Supp. at 817. The court's conclusion that NEPA applies in the Trust Territory followed a thorough and thoughtful review of NEPA's basic purposes, its legislative history and the United States' express commitment to treat the Trust Territory as if it were an integral part of the United States in fulfilling trustee-ship duties to the area's inhabitants. <u>Id.</u> at 816-819. The issue was NEPA's applicability to the geographic area of the Trust Territory rather than its applicability to the Trust Territory government. Yet, by citing <u>People of Enewetak</u> the <u>Gale</u> majority implicitly conceded the logic of <u>People of Enewetak</u>'s reasoning in determining the applicability of federal legislation to the Trust Territory government.

Thus, _Gale_'s endorsement of a specific inclusion test is not so clear or unqualified as defendants perceive it to be. To the extent that _Gale_ actually supports such mechanical analysis,[102/] the Court respectfully declines to follow the decision.[103/] Both the weight of precedent and common sense instruct that courts must construe ambiguous federal legislation, including § 502(a)(2), by considering manifest congressional objectives, legislative history and the United States' fiduciary obligations to Micronesians under the Trusteeship Agreement.

As Judge King observed in _People of Saipan_, in every reported case requiring judicial interpretation of the applicability of ambiguous federal legislation to the Trust Territory, the courts have consulted all available evidence to discover and to effectuate congressional intent. 356 F.Supp. at 650 n.11. Decisions subsequent to _People of Saipan_, including _Gale_ itself, demonstrate the consistency of this sound judicial practice.[104/]

Although the United States Supreme Court has never directly addressed the question of the applicability of federal legislation to the Trust Territory, its precedents also require a purposive approach to statutory construction. The starting point of statutory construction undeniably is the language of the statute itself. _Watt v. Alaska_, 451 U.S. at 266, 101 S.Ct. at 1681. Yet, where, as here, neither the statutory language nor the legislative history provides an express answer, courts must embrace the construction which "more accurately reflects the intention of Congress. is more consistent with the structure of

480

the Act, and more fully serves the purposes of the statute."
F.B.I. v. Abramson, ___ U.S. ___, ___ - ___ and n.7, 102 S.Ct.
2054, 2060-2061 and n.7, 72 L.Ed.2d 376 (1982); accord Rose v.
Lundy, ___ U.S. at ___, 102 S.Ct. at 1203; Vermilya-Brown Co. v.
Connell, 335 U.S. 377, 385-390, 69 S.Ct. 140, 144-147, 93 L.Ed.
76 (1948), reh.denied, 336 U.S. 928, 69 S.Ct. 652, 93 L.Ed. 1089
(1949). If a statute's words and purposes plainly apply to a
situation, the fact that the specific application of the statute
never occurred to Congress does not bar courts from holding that
the situation falls within the statute's coverage. United States
v. Jones, 607 F.2d 269, 273 (9th Cir. 1979), cert.denied 444 U.S.
1085, 100 S.Ct. 1043, 62 L.Ed.2d 77 (1980).

It is also important to construe federal legislation
consistently with the Trusteeship Agreement to the extent that a
harmonious construction is possible. The avoidance of conflict
between statutes and treaties is a fundamental interpretive
principle. E.g., Whitney v. Robertson, 124 U.S. 190, 194, 8 S.Ct.
456, 458, 31 L.Ed. 386 (1888); U.S. v. Vetco, 691 F.2d 1281, 1286
(9th Cir. 1981), cert.denied ___ U.S. ___, 102 S.Ct. 671, 70
L.Ed.2d 639 (1981). The precedents reflect the judiciary's
efforts to give legislation that meaning which accommodates and
promotes the fulfillment of the United States' fiduciary obligations
to Micronesians under the Trusteeship Agreement. See, e.g.,
Ralpho v. Bell, 569 F.2d 607, 626 and n.139, reh. denied 569 F.2d
636 (D.C.Cir. 1977)(construing the Micronesian Claims Act in
harmony with the Trusteeship Agreement's human rights guarantees);

People of Enewetak, 353 F.Supp. at 818-819 (construing NEPA in light of the United States' express commitment to treat the Trust Territory "as if it were an integral part of the United States" and to govern the Trust Territory's inhabitants with "no less consideration" than it would govern people in sovereign United States territory).[105/] Of course, if a treaty and a statute conflict the most recent enactment supersedes the pre-existing law. E.g., U.S. v. Lee Yen Tai, 185 U.S. 213, 220-222, 22 S.Ct. 629, 632-633, 46 L.Ed. 878 (1902); In Re Aircrash in Bali, Indonesia, 684 F.2d 1301, 1309 (9th Cir. 1982). Intended statutory meaning is the ultimate issue in construing a statute such as the Covenant which implements a treaty such as the Trusteeship Agreement. The treaty has no independent significance except as an aid to the statute's proper construction. Hopson v. Kreps, 622 F.2d 1375, 1380 (9th Cir. 1980).

 With reference to the Covenant in particular, the legislative history instructs that ambiguities in the document must be construed in favor of the NMI's people. Representative Phillip Burton, the chairman of the Subcommittee on Territorial and Insular Affairs of the House Committee on Interior and Insular Affairs was one of the Covenant's sponsors and floor managers. Six days before Congress enacted the Covenant, Representative Burton stated:

///
///
///

482

> Our committee's and my own intent is
> that all possible ambiguities should
> be resolved in favor of and to the
> benefit of the people of the Govern-
> ment of the Northern Mariana Islands.

122 Cong.Rec. 7272 (1976).[106/] This interpretive principle

reflects the tradition of giving dependent insular people under

United States jurisdiction the benefit of ambiguities in laws

which particularly affect them.[107/] We now apply these principles

to Covenant § 502(a)(2) in order to determine the applicability of

§ 1981, Title VI and Title VII to the Trust Territory government

and the High Commissioner.

> b. Application of Statutory
> Construction Principles
> to Covenant § 502(a)(2)

In order to construe § 502(a)(2), we must examine its

purposes, its legislative history and its relation to other Covenant

provisions. The Senate Committee on Interior and Insular Affairs

explained § 502 as follows:

> The purpose of this section is to
> provide a workable body of law when the
> new government of the Northern Mariana
> Islands becomes operative pursuant to
> section 1003(b)... [¶] The basic principle
> underlying section 502 is that the federal
> laws applicable to Guam and which are of
> general application to the several States
> shall also apply to the Northern Mariana
> Islands...

S.Rep.No. 433, supra, at 77; accord, Report of the Joint Drafting

Committee on the Negotiating History C-3 (1975), reprinted in id.

at 405; MPSC Analysis at 48-50, reprinted in Senate Interior and

Insular Affairs Committee Hearing on S.J.Res. 107, supra, at 406-408. The NMI's negotiators on the Marianas Political Status Commission (MPSC) believed that "[m]uch federal legislation... is highly desirable and should be made applicable to the Northern Marianas." MPSC Analysis at 15, reprinted in Senate Interior and Insular Affairs Committee Hearing on S.J.Res. 107, supra, at 373 (comment on Covenant § 105). The MPSC sought to prevent the application of laws which were either uniquely applicable to Guam or capable of affecting the NMI without similarly applying to the fifty states. Id. at 16, 53, reprinted in Senate Interior and Insular Affairs Committee Heaing on S.J.Res. 107 at 374, 411. In its analysis of Covenant § 105, the MPSC emphasized that:

> The Trust Territory of the Pacific Islands... [is] now wholly run by the Executive branch of the federal government and... can be affected not only by a wide variety of federal legislation, but also by executive orders over which they have no control. This will not be true with respect to the Commonwealth of the Northern Marianas. It will not even be true prior to the establishment of the Commonwealth, for section 105 comes into effect before termination.

Id. at 16, reprinted in Senate Interior and Insular Affairs Committee Hearing on S.J.Res. 107 at 374 (emphasis added).

The MPSC further explained that "it was not possible for the MPSC and the United States delegation to review each federal law to determine whether and how it should apply." Id. at 48, reprinted in Senate Interior and Insular Affairs Committee Hearing on S.J.Res. 107 at 406 (emphasis added). As indicated above in

Part III, it is unclear to what extent the Covenant negotiators discussed the Trust Territory government's continuing presence on Saipan or the relocation of that government's headquarters. Covenant § 801 requires the Trust Territory government to transfer its real property holdings in the NMI to the NMI government "no later than upon the termination of the Trusteeship Agreement... (emphasis added)." This language suggests that the Covenant negotiators anticipated the possibility that the Trust Territory government might remain on Saipan for the duration of the Trustee-ship. During the Senate Foreign Relations Committee's review of the Covenant, Speaker Henry of the Congress of Micronesia's House of Representatives urged the United States Congress to accompany the Covenant's approval with the enactment of legislation to fund the relocation of the Trust Territory government. Senate Foreign Relations Committee Hearing on H.J.Res. 549, supra, at 88-89. Speaker Henry expressed concern that the new NMI government would be able to exercise taxing and regulatory authority over the Trust Territory government. Id. at 88. In a telegram sent to the chairman of the Senate Foreign Relations Committee, Speaker Henry and Congress of Micronesia Senate President Nakayama specifically identified "conflicting laws and their application" as one of the difficulties which would result if the Trust Territory government's headquarters remained in the NMI. Id. at 169. In its joint report with the Senate Armed Services Committee, the Foreign Relations Committee noted these concerns. S.Rep.No. 596 at 9, reprinted in 1976 USCAN, supra, at 456. Neither the committee nor the full

485

Congress endorsed or otherwise acted upon Speaker Henry's legislative proposal.108/

The Court must construe § 502(a)(2) in a manner which most fully serves the statute's purposes and nurtures its basic policies. Abramson, ___ U.S. at ___, and n.7, 102 S.Ct. at 2061 and n.7; Rose, ___ U.S. at ___, 102 S.Ct. at 1203. Assuming arguendo that the Covenant negotiators and Congress did not foresee the Trust Territory government's continued presence in the NMI, the Court must construe § 502(a)(2) consistently with what the negotiators and Congress would have intended had they acted at the time of the legislation with the present situation in mind. Vermilya-Brown, 335 U.S. at 388, 69 S.Ct. at 146.

After carefully weighing the evidence above, the Court concludes that the Trust Territory government and the High Commissioner must comply with federal legislation which applies in the NMI through the operation of § 502(a)(2), unless the legislation's language or purposes instruct otherwise. Because there is no contrary indication in the language or policy of § 1981, Title VI or Title VII, the Trust Territory government and the High Commissioner must comply with those statutes. Statements at congressional hearings made by interested parties as to problems requiring legislative attention are useful aids in determining legislative intent. See 2A Sutherland Statutory Construction § 48.10 at 209 (4th Ed. 1973). This is especially true when the statements receive acknowledgement in a formal committee report. See note 40, supra. On the basis of the testimony presented by the Congress of

Micronesia leaders, one must presume that the United States Congress was aware that the Covenant would subject the Trust Territory government to an increased number of laws in the NMI upon the inception of Commonwealth government pursuant to Covenant § 1003(b). The language of the Covenant § 801 strongly indicates that the Covenant negotiators understood that the Trust Territory government might remain on the NMI until the end of the trusteeship. The negotiators clearly expressed their intent when they desired to create exceptions to the Covenant's applicability of laws provisions. See note 90, supra. Those exceptions do not arguably extend to the Trust Territory government or to the High Commissioner.

To the extent that the intended applicability of § 502(a)(2) to the Trust Territory government is unclear, the ambiguity must be resolved in favor of the people of the NMI. See notes 106-107 and accompanying text, supra. The NMI sought to ensure that its people would receive the protection of federal laws well before the termination of the trusteeship. The purpose of promptly implementing § 502(a)(2) and other Covenant provisions was to afford the NMI's people as many of the benefits of the NMI's new political status as early as possible and to protect them in the event that the trusteeship continued longer than expected for reasons beyond their control, as the trusteeship ultimately has. Sablan Construction, 526 F.Supp. at 139 and n.13; see MPSC Analysis at 133, reprinted in Senate Interior and Insular Affairs Committee Hearing on S.J.Res. 107, supra, at 491. While chairing his House

487

subcommittee's discussion of the Covenant plebiscite, Representative

Burton articulated the policy which is organic to the Covenant's

spirit:

> [O]ur objective is to respect the free will of the people of the Northern Marianas. We do not want the Trust Territory High Commissioner's office to influence the outcome[109] ... We want the people of the Northern Marianas to have the freest and most open opportunity to speak for themselves, and to choose a future for themselves.

Marianas Political Status: Hearing Before the Subcommittee on

Territorial and Insular Affairs, United States House of Represen-

tatives Committee on Interior and Insular Affairs, 94th Cong. 1st

Sess. 122 (1975). The Covenant, and thus § 502(a)(2), represents

the United States' fulfillment of its obligation under Trusteeship

Agreement Article 6.1 to grant self-government in accordance with

the wishes of the NMI's people. S.Rep.No. 433, supra, at 23. The

rationale expressed by Representative Burton therefore also applies

forcefully in determining whether the Trust Territory government

and the High Commissioner are bound by § 502(a)(2). As demonstrated

in the MPSC's Covenant analysis, one of the NMI people's core

objectives was to eliminate governance through unilaterally imposed

executive orders. Although the Trust Territory government has no

governmental authority in the NMI, High Commissioner Executive

Order 119 undeniably affects the livelihood and welfare of NMI

residents who work for the Trust Territory government. It is a

classic example of the type of "executive orders over which they

have no control." Analysis at 16, reprinted in Senate Interior

488

and Insular Affairs Committee Hearing, supra, at 374. By concluding that the High Commissioner may affect the lives of the NMI's people through executive order notwithstanding § 502(a)(2), the Court would frustrate rather than nurture one of the Covenant's most basic policies. The Court is sensitive to the fact that the Trust Territory government occupies a difficult position during the twilight of the trusteeship. The Trust Territory government's continued presence in the NMI is the unfortunate result of the United States' failure to fulfill its self-admitted and "long recognized" responsibility to fund the relocation of the Trust Territory government. Senate Foreign Relations Committee Hearing on H.J.Res. 549, supra, at 41, 44 (statement of the President's Personal Representative to the Covenant negotiations). Nevertheless, it does not follow that federal laws applied by § 502(a)(2) are inoperative as to the Trust Territory government because the United States may have defaulted on that responsibility. Situations not expressly covered by the Covenant are subsumed by its underlying policies. Rose v. Lundy, ___ U.S. at ___, 102 S.Ct. at 1203. Assuming arguendo that neither the Covenant negotiators nor Congress anticipated the Trust Territory government's ongoing presence in the NMI, the fact that the specific application of § 502(a)(2) to the Trust Territory government never occurred to the Covenant's framers is unimportant so long as the application is consistent with the framer's fundamental objectives. See United States v. Jones, 607 F.2d at 273. The framers' intent is the ultimate issue in expounding the Covenant's meaning. See

Hopson v. Kreps, 622 F.2d at 1380. Where, as here, the Trust
Territory govenment's interests collide with the Covenant's
policies, the Court accordingly must deny defendants' motion to
dismiss the § 1981 claims.

2. Issues Relevant to Defendants'
Summary Judgment Motion

Defendants present two arguments for summary judgment
on the § 1981 claims. Neither contention is meritorious.

First, defendants assert that the applicable statute of
limitations may bar plaintiffs' claims.[110/] The Court disagrees.
The applicable limitations period is the six-year "catch-all"
provision in 6 T.T.C. § 305. Since plaintiffs' claims accrued at
the earliest on January 9, 1978, the claims are timely. More-
over, the First Amended Complaint challenges an ongoing and
systematic policy of discrimination rather than a discrete act of
discrimination. Under the federal "continuing violation" doctrine,
the statute of limitations is not a bar. Chung v. Pomona Valley
Community Hospital, 667 F.2d 788, 791 (9th Cir. 1982)(collecting
cases).

Second, defendants argue that only racial discrimination
is actionable under § 1981. Noting that the Trust Territory's
pay scales facially discriminate on the basis of alienage,
defendants maintain that § 1981 does not prohibit national origin
or alienage discrimination, and that therefore no § 1981 cause of
action lies. After carefully considering this argument, the
Court must deny summary judgment.

Although the Trust Territory's pay scales ostensibly discriminate solely on grounds of alienage, plaintiffs have alleged that the pay scales also discriminate on a racial basis. See note 8 supra. In General Building Contractors Assoc. v. Pennsylvania, ___ U.S. ___, ___, 102 S.Ct. 3141, 3149-3150, 73 L.Ed.2d 885 (1982), the Supreme Court held that § 1981 requires proof of intentional discrimination. The Court questions whether plaintiffs will be able to prove the existence of purely racially discriminatory intent. Nevertheless, even when the evidentiary facts are undisputed, summary judgment is inappropriate when contradictory inferences may be drawn from those facts or where motive and intent play a leading role in determining liability and the proof is largely in defendants' hands. Sherman Oaks Medical Center v. Carpenters Local Union, 680 F.2d 594, 598 (9th Cir. 1982). As recently explained by the Supreme Court in a civil rights class action:

> [D]iscriminatory intent need not be proven by direct evidence. 'Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another.' (citation omitted). Thus determining the existence of a discriminatory purpose demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available (citation omitted).

Rogers v. Lodge, ___ U.S. ___, ___, 103 S.Ct. ___, ___, 73 L.Ed.2d 1012, 1018 (1982). Given the inadequate factual record here, the

Court cannot engage in this sensitive inquiry on a motion for summary judgment. <u>Williams v. DeKalb County</u>, 82 F.R.D. 10, 13 (N.D.Ga. 1979).

Recent precedent within the Ninth Circuit disposes of defendants' argument that national origin discrimination is not actionable under § 1981. In <u>Ortiz v. Bank of America</u>, 547 F.Supp. 550 (E.D.Cal. 1982), the court's thorough and scholarly opinion reviewed the legislative history and judicial construction of § 1981. The court correctly observed that neither the Supreme Court nor the Ninth Circuit has decided whether there is tenable distinction between racial discrimination claims and national origin discrimination claims for purposes of § 1981. <u>Id.</u> at 556-559. The court then analyzed three lines of § 1981 cases from other circuits.[111]/ One group of cases that § 1981 does not support a cause of action for national origin discrimination. <u>Id.</u> at 560-561. A second series of decisions allows ethnic plaintiffs who allege national origin discrimination to survive a dismissal motion, but requires plaintiffs to bear the burden of proving that the alleged discrimination was of a "racial character." <u>Id.</u> at 561-562, 564 n.21. The third line of authority maintains that "the scope of section 1981 cannot be limited by any strict notion of race", that "the line between racial and national origin discrimination may not exist," and that therefore "plaintiffs [may] state a valid claim under section 1981 regardless of whether their claim is characterized as one of national origin, race, alienage or ethnicity." <u>Id.</u> at 562. <u>See</u> <u>generally</u> <u>id.</u> at

492

562-565. The Court concluded that "the terms 'race' and 'national origin' are incapable of mutually exclusive definitions which are more than arbitrary." Id. at 558 n.13. See also id. at 555-556 nn.6-7 and 9, 560 and n.18, 652 n.20, 565-567. Finding the third line of decisions to be far more persuasive, the court held that a § 1981 claim lies where plaintiff alleges membership in "a group composed of both men and women[112] the boundaries of which are not fixed by age[113] or religious faith,[114] and which is of a character that is or may be perceived as distinct when measured against the group that holds the broadest rights." Id. at 568. The Court adopts Ortiz' holding and supporting rationale. See id. at 553-568.

Finally, the Court rejects defendants' contention that § 1981 is inapplicable to alienage-based discrimination. The Supreme Court has declared that § 1981 protects all persons against governmental discrimination based on alienage. Takahashi v. Fish & Game Commission, 334 U.S. 410, 419, 68 S.Ct. 1138, 1142, 92 L.Ed. 1478 (1948)(construing 8 U.S. § 41, which was subsequently recodified as § 1981). Under a contrary view taken by some courts, Takahashi establishes only that aliens are protected against discrimination which violates § 1981, and does not establish that § 1981 creates a cause of action for alienage-based discrimination see, e.g., Rios v. Marshall, 530 F.Supp. 351, 361 and n.9 (S.D.N.Y. 1981). This Court cannot concur in that view. The California statute which was challenged in Takahashi explicitly discriminated on the basis of eligibility of citizenship. See 334 U.S. at 413

n.3. 68 S.Ct. at 1139 n. 3. The Los Angeles County Superior Court invalidated the statute on Fourteenth Amendment equal protection grounds. Id. at 414, 68 S.Ct. at 1140. Upholding this ruling, the Supreme Court relied upon the equal protection doctrine developed in alienage discrimination decisions such as Truax v. Raich, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131 (1915). See id. at 415-420 and nn.6-7, 68 S.Ct. at 1140-1143 and nn.6-7. The weight of authority holds that § 1981 prohibits alienage-based governmental discrimination. See, e.g., Espinoza v. Hillwood Square Mutual Assoc., 522 F.Supp. 1121, 1137 n.1A (N.D.Cal. 1977); Comment, Developments in the Law-Section 1981, 15 Harv.C.R.-C.L. L.Rev. 29, 90-92 (1980)(Comment on § 1981). Defendants' motions for summary judgment on plaintiffs' § 1981 claims are denied.

## C. § 1983 Claims

We now address plaintiffs' § 1983 claims. Section 1983 states in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, or any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Section 1983 is not a source of substantive rights. Chapman v. Houston Welfare Rights Organization, 441 U.S. at 618, 99 S.Ct. at

494

1916. For this reason, we cannot determine the viability of plaintiffs' § 1983 claims solely on the basis of Covenant § 502(a)(2). The resolution of that question involves three analytical steps. [115/]

 1. Applicability of the Equal Protection and Due Process Guarantees of the Fifth and Fourteenth Amendments to the United States Constitution to the Trust Territory Government and the High Commissioner

The first inquiry in any § 1983 suit is whether plaintiff has been deprived of a right secured by the Constitution or laws of the United States. Baker v. McCollan, 443 U.S. 137, 140, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979). Plaintiffs allege the violation of the due process and equal protection guarantees of the Fifth and Fourteenth Amendments to the United States Constitution. Covenant § 501(a) recognizes the applicability of those guarantees in the NMI. [116/] Thus, the instant motions squarely present the issue of whether federal constitutional guarantees of equal protection and due process are restraints upon the authority of the Trust Territory government in general and the High Commissioner in particular. The Court holds that they are.

In a series of decisions known as the Insular Cases, [117/] the Supreme Court articulated an analytical framework for determining the applicability of the Constitution in United States-controlled overseas areas. Under this doctrine, the entire Constitution automatically applies in "incorporated terri-

tories."[118]/ In contrast, only fundamental constitutional rights apply of their own force in "unincorporated territories."[119]/ E.g., Examining Board of Engineers, Architects and Surveyors v. Flores de Otero, 426 U.S. 572, 599 n.30, 96 S.Ct. 2264, 2280 n.30, 49 L.Ed. 65 (1976). Both equal protection and due process are among the fundamental rights which apply of their own force. See Balzac v. Puerto Rico, 258 U.S. 298, 313, 42 S.Ct. 343, 348, 66 L.Ed. 627 (1922) (due process); Downes v. Bidwell, 182 U.S. 244, 282, 21 S.Ct. 770, 785 45 L.Ed. 1146 (1901) (due process and equal protection)(plurality).[120]/

Although the areas involved in the Insular Cases were territories in which the United States claimed sovereignty, courts have implicitly recognized that the term "unincorporated territory" is sufficiently elastic to include the geographic area of the Trust Territory. See Ralpho v. Bell, 569 F.2d at 618-619 and nn.69-70; Thompson v. Kleppe, 424 F.Supp. 1263, 1268-1269 (D. Haw. 1976).[121]/ In Ralpho, Kleppe and Porter v. United States, 496 F.2d 583, 591, (Ct.Cl. 1974) cert.denied 420 U.S. 1004, 95 S.Ct. 14416, 43 L.Ed.2d 761 (1975), the courts held that the United States government's actions in the Trust Territory are restrained by fundamental due process rights.[122]/ Ralpho and Kleppe correctly decided that the United States' status as a trustee rather than as a sovereign is constitutionally immaterial. 569 F.2d at 619 and n.72; 424 F.Supp. at 1267. These courts recognized that "in determining whether a provision of the Constitution applies to new subject matter, it is of little significance that it is one with

which the framers were not familiar." United States v. Classic.
313 U.S. 299, 316, 65 S.Ct. 1031, 1038, 85 L.Ed. 1368 (1941). "The
great clauses of the Constitution are to be considered in the light
of our whole experience, and not merely as they would be interpreted
by its framers in the conditions and with the outlook of their time.
United States Trust Co. of New York v. New Jersey, 431 U.S. 1, 15-
16, 97 S.Ct. 1505, 1514, 52 L.Ed.2d 92 (1977).

In Porter, the court indicated that the United States
could not be held vicariously liable under the Fifth Amendment's
Just Compensation Clause for actions by the Trust Territory Attorney
General and another lower level Trust Territory official. See
496 F.2d at 591-592. Porter did not involve a challenge to High
Commissioner action, as this case does. To the extent that
Porter suggests that the Constitution does not operate against
the High Commissioner or the Trust Territory government, the
Court must respectfully disagree.

As reaffirmed by the Supreme Court and in Ralpho v. Bell.
"there cannot exist under the American flag[123/] any governmental
authority untrammeled by the requirements of due process of law."
569 F.2d at 618-619 and n.70, citing Calero-Toledo v. Pearson Yacht
Leasing Co., 416 U.S. 663, 669 n.5, 94 S.Ct. 2080, 2084 n.5, 40 L.Ed.2d 452 (1974)
Defendants do not dispute that the High Commissioner is a federal
officer. It is well-settled that the fundamental provisions of
the United States Constitution restrict the authority of federal
officers in United States-controlled territories. E.g., Farrington
v. Tukushige, 273 U.S. 284, 299 9, 47 S.Ct. 406, 409, 71 L.Ed. 646

497

(1927). Both this Court and Kleppe accordingly have recognized
that the High Commissioner is subject to the Constitution. See
Bauer, supra, at 23; 424 F.Supp. at 1266-1267. It is also beyond
debate that the Trust Territory government is a separate but
subordinate entity "created pursuant to the authority of Congress."
People of Saipan, 502 F.2d at 95; see Part IV-B, supra.124/
Therefore, the fundamental constitutional provisions which limit
the United States' governmental authority also necessarily restrain
the power of territorial governments created under congressional
authorization. See, e.g., Anderson v. Scholes, 83 F.Supp. 681,
687 (D.Alaska 1949). See also Harris v. Municipality of St. Thomas
& St. John, 111 F.Supp. 63, 65 (D.V.I. 1953), aff'd 212 F.2d 323
(3d Cir. 1954)(territorial governments are "temporary sovereign
governments" organized under the laws of Congress and limited
only by the organic law and the Constitution of the United States).
The reason for the Trust Territory government's existence - the
fulfillment of the United States' trusteeship obligations -
admittedly is unique. In contrast, its congressionally delegated
authority is at least as limited as that of other territorial
governments, and remains subject to "a similar kind of control
and supervision from the United States." Gale v. Andrus, 643
F.2d at 833.

For these reasons, the Court concludes that federal
constitutional guarantees of equal protection and due process
operate against the Trust Territory government and the High
Commissioner. Analysis is the same under the Fourteenth Amend-

ment's Equal Protection Clause and under the equal protection component of the Fifth Amendment's Due Process Clause. Buckley v. Valeo, 424 U.S. 1, 93, 96 S.Ct. 612, 670, 46 L.Ed.2d 659 (1976). The Fifth and Fourteenth Amendment Due Process Clauses are also analytically coextensive. Therefore, it is unnecessary to decide whether it is the Fifth Amendment or the Fourteenth Amendment which acts as the specific limitation. Cf. Flores de Otero, 426 U.S. at 601, 96 S.Ct. at 2280-2281 (Puerto Rico); Alaska Steamship Co. v. Mullaney, 180 F.2d 805, 817 (9th Cir. 1950)(Alaska).

2. The High Commissioner's
 Promulgation of the Trust
 Territory Headquarters
 Salary Plan as Action Under
 Color of Territorial Law
 for Purposes of § 1983

 a. Action Under Color
 of Territorial Law

The second analytical step is to determine whether the High Commissioner acted under color of law of a "Territory". We first turn to the "color of law" inquiry. Action under color of law is a jurisdictional prerequisite to a § 1983. Cox v. Hellerstein, 685 F.2d 1098, 1099 (9th Cir. 1982). As this Court observed in Bauer v. McCoy, supra, because the High Commissioner functions as both an Interior Department official and as a territorial chief executive, it is important to determine whether the challenged action was taken under color of federal law or territorial law. See Bauer, Decision at 20-21 characterizing the High Commissioner's determination of an Interior Department employee's

499

educational allowance reimbursement under 5 U.S.C. § 5924(4)(A) as action under color of federal law).

The Court concludes that the High Commissioner's promulgation of the disputed pay scales through Executive Order No. 119 was action under color of territorial law. The High Commissioner issued Order 119 pursuant to authority claimed under Secretarial Order 3039. See note 3, supra. Local laws enacted under legislative power granted by Congress are territorial laws rather than laws of the United States. E.g., Harris v. Boreham, 233 F.2d at 113 (collecting cases). Because Order 3039 is a "law" promulgated as local "legislation" pursuant to congressionally derived authority, the High Commissioner's action in reliance upon the order constituted action under color of territorial law.

b. The Trust Territory of the Pacific Islands as a "Territory" For Purposes of § 1983

Defendants also contend that the Trust Territory of the Pacific Islands is not a "Territory" for purposes of § 1983. In support of this proposition defendants cite the ruling in Thompson v. Kleppe that "the Trust Territory is not a State within § 1983..." 424 F.Supp. at 1265.

Stare decisis does not require one district judge to follow the decision of another. Starbuck v. City and County of San Francisco, 556 F.2d 450, 457 n.13 (9th Cir. 1977). A court should give less deference to a decision which was "rendered without benefit of a full airing of all the relevant considerations

500

Monell v. Department of Social Services of the City of New York.
436 U.S. 658, 709 n.6 98 S.Ct. 2018, 2045 n.6 56 L.Ed.2d 611 (1978)
(Powell, J., concurring). Kleppe's § 1983 ruling was a summary
pronouncement which did not weigh the relevant statutory construc-
tion policies or analyze § 1983's legislative history and judicial
interpretation. For the reasons which follow, the Court respect-
fully departs from Kleppe and holds that the Trust Territory of
the Pacific Islands is a "Territory" for purposes of § 1983.

Section 1983 is remedial legislation designed to preserve
human rights. Therefore, it must be liberally and beneficially
construed. Owen v. City of Independence, Missouri, 445 U.S. 622,
636, 100 S.Ct. 1398, 1408, 63 L.Ed.2d 673 (1980. Its language
must be given "'the largest latitude consistent with the words
employed'...". Id.

> The contours of § 1983 must neces-
> sarily remain flexible to accommodate
> changing circumstances and the exigen-
> cies of a given era. Because it is
> remedial in nature, § 1983 is appro-
> priately suited to redress any new
> method of interference with the
> rights which its words protect. 'For
> it is the constitutional right, regard-
> less of the method of interference,
> which is the subject of the statute
> and which in precise terms it protects
> from injury or oppression.' (citation
> omitted).

Green v. Dumke, 480 F.2d 624, 268 n.7 (9th Cir. 1973).

Under settled Supreme Court principles of statutory
construction, the word "territory" is an inherently ambiguous and
elastic term. Its meaning depends upon the character and aim of

501

the legislation presented. People of Puerto Rico v. Shell Co., 302 U.S. 253, 258, 58 S.Ct. 167, 169, 82 L.Ed. 235 (1937). When expounding the meaning of the term "territory", courts consider the statutory language, the law's purposes and the context and circumstances in which the words were employed. District of Columbia v. Carter, 409 U.S. 418, 420, 93 S.Ct. 602, 604, 34 L.Ed. 2d 613, reh.denied 410 U.S. 959, 93 S.Ct. 1411, 35 L.Ed.2d at 694 (1973); People of Puerto Rico, 302 U.S. at 258, 58 S.Ct. at 169. "'When Congress uses the term 'territory', this may be meant to be synonymous only with 'place' or 'area', and not necessarily to indicate that Congress has in mind the niceties of language of a political scientist...'". United States v. Villarin Gerena, 553 F.2d 723, 726 (1st Cir. 1977).

Section 1983 is part of the Civil Rights Act of 1871. Congress passed the 1871 Act for the express purpose of enforcing the Fourteenth Amendment. Congress intended to create a remedy as broad as the Fourteenth Amendment affords the individual. Lugar v. Edmunson Oil Co., ___ U.S. ___, ___, 102 S.Ct. 2744, 2752-2753, 73 L.Ed.2d 482 (1982). Section 1983 originally applied only to action under color of state law. In 1874, Congress added the words "or Territory" without explanation. Flores de Otero, 426 U.S. at 582, 96 S.Ct. at 2272.

In District of Columbia v. Carter, the Supreme Court held that the District of Columbia is not a "State or Territory" for purposes of § 1983. 409 U.S. at 424, 93 S.Ct. at 606. The court explained the practical needs which led to the inclusion of

502

territories within § 1983:

> [E]ffective federal control over the activities of territorial officials was virtually impossible. Indeed, "the territories were not ruled immediately from Washington Rather Congress left municipal law to be developed largely by the territorial legislatures within the framework of organic acts and subject to a retained power of veto. The scope of self-government exercised under delegations was nearly as broad as that enjoyed by the States... (citations omitted) [A]lthough the Constitution vested control over the Territories in the Congress, its practical control was both confused and ineffective, making the problem of enforcement of civil rights in the Territories more similar to the problem as it existed in the States than in the District of Columbia.

Id. at 430, 93 S.Ct. at 609. The court's ruling that the District of Columbia was not within § 1983 rested upon the unique ability of Congress to monitor the activities of local officials at the national seat of government. Id. at 429-430, 93 S.Ct. at 608-609. Six years later, Congress overruled Carter by amending § 1983 to include the District of Columbia. See generally H.R.Rep. No. 96-548, 96th Cong. 1st Sess., reprinted in 1979 U.S.Code Cong. & Ad. News 2609. 125/

When Congress initially passed § 1983 the United States had no insular dependencies. The territories under United States jurisdiction at that time were all "incorporated territories" destined for statehood. See District of Columbia v. Carter, 409 U.S. at 431-432, 93 S.Ct. at 610. The only application of § 1983

503

which the enacting Congress logically could have contemplated was the statute's application within the continental United States. Nevertheless, as reaffirmed by the Ninth Circuit, section 1983 is a dynamic and flexible statute which was designed to "*accommodate changing circumstances and the exigencies of a given era.*" Green v. Dumke, 480 F.2d at 628 n.7. Its language must be given generous latitude in order to achieve the statute's remedial purposes. Owen v. City of Independence, 445 U.S. at 636, 100 S.Ct. at 1408. The Court accordingly must construe the word "Territory" in § 1983 as the lawmakers would have done at the time of the legislation if they had acted with the present situation in mind. See People of Puerto Rico v. Shell Co., 302 U.S. at 257, 58 S.Ct. at 169, cf. Vermilya-Brown Co. v. Connell, 335 U.S. at 388, 69 S.Ct. at 146 (same principle stated with respect to construction of the word "possession").

Congress intended to prevent the violation of constitutional rights by federally appointed territorial officials located beyond effective control or supervision by the national government. Congress viewed this need as particularly pressing in light of the territory's dependent state of "pupilage" and the "transitory nature of the territorial condition." District of Columbia v. Carter, 409 U.S. at 431-432, 93 S.Ct. at 610. These same considerations forcefully apply with respect to the Trust Territory. The Interior Department's stated policy has been to encourage autonomy in territorial governments including the Trust Territory government. See Van Cleve, supra, at 144-149. As a consequence of this

504

policy of restraint, direct and immediate supervision of the Trust Territory government by the federal government apparently has not occurred. Moreover, the concept of trusteeship implies a regime of territorial administration which is inherently transitory in nature. The Court therefore believes that if the framers of § 1983 had foreseen the advent of the Trust Territory, they would have regarded it as a "Territory" to which § 1983 applies. This conclusion is reinforced by the fact that the governmental action challenged here is action by the High Commissioner, who is a federally-appointed territorial chief executive. The fact that the United States is not sovereign in the Trust Territory is a distinction without material significance.[126]/ As indicated in Green v. Dumke, § 1983 accommodates diversity and changing circumstances. Where, as here, the application of a statute to new subject matter is consistent with the statute's purposes, it is unimportant that the specific application never occurred to the enacting Congress. See United States v. Jones, 609 F.2d at 273. The Court does not suggest that every statute which contains the word "territory" automatically applies to the Trust Territory. Section 1983 is unique in that its expansive language must be given the largest possible latitude. Moreover, Trusteeship Agreement Article 3 cautions that applicable federal laws should be appropriate to the circumstances of the Trust Territory. By its very nature § 1983 is a statute which reaches only government action. As indicated in District of Columbia v. Carter, the word "Territory" in § 1983 is a term which is not merely a geographic reference, but

a delimitation of the type of conduct proscribed. 409 U.S. at 421

93 S.Ct. at 604. Where, as here, the statute affords the Trust

Territory's people a remedy against the administering authority,

it is both consistent with the Trusteeship Agreement and appro-

priate to the Trust Territory's circumstances to conclude that

the statute is applicable.

For the reasons above, the Court holds that the Trust

Territory of the Pacific Islands is a "Territory" for purposes of

§ 1983.

3. The Trust Territory Government
 and the High Commissioner as
 Suable "Persons" Under § 1983

The final inquiry is whether the Trust Territory

government and the High Commissioner are suable "persons" under

§ 1983. The Court concludes that they are. As indicated above,

the Trust Territory government's common law immunity neither

extends into federal court nor insulates it against actions

alleging violations of federal law. See notes 66-67 and accompa-

nying text. Moreover, in Monell v. Department of Social Services

the Supreme Court held that local government bodies and local

government officials may be sued in their official capacities

under § 1983. 436 U.S. at 688-690 and n.55, 98 S.Ct. at 2034-

2036 and n.55. The Trust Territory government is not a municipal

corporation as was the defendant in Monell. Nevertheless, its

relationship to the United States government, like that of other

territorial governments created pursuant to congressional authority,

is a relationship which may be accurately compared to the relation-
ship between a municipality and a State. See United States v.
Wheeler, 435 U.S. at 321 n.16, 98 S.Ct. at 1085 n.16 (collecting
authorities). Monell indicated that the Congress which enacted
§ 1983 intended that all "bodies politic and corporate" would be
suable § 1983 "persons." See 436 U.S. at 688-9 and n.53, 98 S.Ct.
at 2034-5 and n.53. The Trust Territory government clearly is a
"body politic" and it does not possess any federal constitutional
or statutory immunity from § 1983 claims. Therefore, under
Monell's rationale both the Trust Territory government and the
High Commissioner must be considered to be "persons" against whom
§ 1983 actions may lie. Defendants' dismissal motions are denied.
Because material factual issues remain concerning plaintiffs'
§ 1983 claims, the Court also denies summary judgment.

### D. Title VI Claims

Title VI applies within the NMI to the Trust Territory
government and the High Commissioner for the reasons stated in
Part V-B-1-a & b, supra. Defendants urge dismissal upon the
additional ground that Title VI does not create private causes
of action. Neither the Supreme Court nor the Ninth Circuit has
squarely decided this issue, and the holdings from other lower
courts are inconclusive.127/

This case does not require the Court to reach the
question of whether Title VI generally affords a private right of
action. On the basis of 42 U.S.C. § 2000d-3, the Court holds that

507

a private suit challenging employment practices is unavailable under Title VI where, as here, the primary purpose of federal financial assistance to defendant is not the provision of employment.[128] Section 2000d-3 states that "[n]othing in... [Title VI shall be construed to authorize action under... [Title VI] by any department or agency with respect to any employment practice of any employer... except where a primary objective of the Federal financial assistance is to provide employment." Although Title VI must be liberally construed in order to effectuate its remedial purposes,[129] like all statutes it also must be construed with reference to the overall statutory scheme of which it is part. Adams v. Howerton, 673 F.2d 1036, 1040 (9th Cir. 1982). Title VI and Title VII are part of the 1964 Civil Rights Act. Title VII contains extensive and detailed provisions for private employment discrimination suits against governmental employers. The language and structure of § 2000d-3 and Title VII thus suggest that Congress intended Title VII, rather than Title VI, to be the remedy provided by the 1964 Civil Rights Act for employment discrimination. The Court's conclusion is reinforced by Scanlon v. Atascadero State Hospital, 677 F.2d 1271 (9th Cir. 1982). Scanlon concerned the availability of private employment discrimination suits under the Rehabilitation Act (29 U.S.C. § 794), a statute with remedies expressly designed to be identical to those under Title VI.[130] The Ninth Circuit held that a private action cannot be maintained unless a primary objective of the federal financial assistance is to provide employment. Id. at 1273.[131] While this holding did

not directly apply to Title VI, it must be viewed as persuasive guidance. If a private action is not maintainable under a statute which is remedially coextensive with Title VI, the Court must conclude that the same limitation applies to Title VI. Plaintiffs' Title VI claims accordingly are dismissed on the basis of § 2000d-3 for lack of subject matter jurisdiction.

### E. Title VII Claims

Title VII applies within the NMI to the Trust Territory government and the High Commissioner under the rationale expressed in Part V-B-1-a & b, supra. Title 42 U.S.C. § 2000e(i) includes the fifty states and Guam within the definition of the "States" to which Title VII applies. Under Covenant § 502(a)(2), the NMI also is a "State" for purposes of Title VII.[132] The Trust Territory government and the High Commissioner are both "persons" under § 2000e(a) and therefore fit within § 2000e(b)'s definition of "employers" who must comply with Title VII.

Although defendants' other arguments lack merit,[133] the Court agrees that plaintiffs' Title VII claims must be dismissed for failure to file a charge with the Equal Opportunity Employment Commission as required by 42 U.S.C. § 2000e-5(e). In Zipes v. Trans-World Airways, ___ U.S. ___, ___, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982), the Supreme Court held that the requirement of a timely EEOC filing within 180 days following an act of discrimination is non-jurisdictional and subject to waiver, estoppel and equitable tolling. Where, as here, a complaint which challenges

a systematic policy of discrimination rather than a discrete act
of discrimination, the "continuing violation" doctrine may provide
for equitable tolling of the timely filing requirement. See
Williams Owens-Illinois Inc., 665 F.2d 918, 923-925 (9th Cir.
1982); London v. Coopers & Lybriand, 644 F.2d 811, 815-816 (9th
Cir. 1981). The doctrine's purpose is to allow Title VII relief
for discrimination which predates the 180 limitation period defined
by § 2000e-5(e).[134/] See Carty, The Continuing Violation Theory of
Title VII After United Airlines Inc. v. Evans, 31 Hastings L.J. 929,
931 (1980); Note, Title VII and the Continuing Violation Theory: A
Return to Congressional Intent, 47 Fordham L.Rev. 894, 895, (1979).
Nevertheless, Zipes merely held that the requirement of a timely
filing is non-jurisdictional; it did not eliminate the EEOC filing
requirement altogether. As explained in Perez v. Dana Corp., 545
F.Supp. 950, 953 (E.D.Pa. 1982), "Zipes held that an untimely EEOC
filing does not per se create a bar to suit. It did not hold, as
plaintiff contends, that an absolute failure to file any charge
with the EEOC is excusable. To do so would render administrative
framework a nullity and permit parties to avoid the entire 'adminis-
trative pressure to reconcile their dispute' (citation omitted)."
Plaintiffs' Title VII claims are dismissed for lack of subject
matter jurisdiction.

///
///
///
///

510

VI. CIVIL RIGHTS ACTS CLAIMS
 AGAINST THE UNITED STATES,
 THE INTERIOR DEPARTMENT,
 AND THE INTERIOR SECRETARY

Plaintiffs cannot maintain any of their civil rights acts claims against the United States or the Interior defendants. The Court dismisses the § 1981, § 1983 and Title VI for lack of subject matter jurisdiction. It grants defendants summary judgment on the Title VII claim.

A. § 1981 Claims

The Court's conclusion that it lacks jurisdiction over plaintiffs' § 1981 claim rests upon its analysis of Bowers v. Campbell, 505 F.2d 1155 (9th Cir. 1974) and Brown v. General Services Administration, 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976). In Bowers, the Ninth Circuit held that § 1981 waives the United States' governmental immunity where plaintiff avers ultra vires conduct by a federal official. 505 F.2d at 1158. Although plaintiffs allege omissions and negligent supervision by the Interior defendants, they do not allege any direct ultra vires action by the United States or the Interior defendants which brings this case within Bowers. Moreover, Bowers is unhelpful to plaintiffs in light of Brown. In Brown, the Supreme Court ruled that Title VII is the exclusive remedy for federal employment discrimination. 425 U.S. at 828-829; 96 S.Ct. at 1966. The court clearly predicated this holding upon the rationale that the United States is not subject to suit under § 1981. See id. at 823-824,

511

827-829 and n.8, 833-834, 96 S.Ct. at 1963, 1965-1966 and n.8, 1968. In the Court's view, Brown implicitly repudiates Bowers' conclusion that § 1981 waives the United States' immunity. See Taylor v. Jones, 495 F.Supp. 1285, 1290 (E.D.Ark. 1980); Reiss, Requiem For An Independent Remedy, 50 S.Cal.L.Rev. 961, 976-982 (1977); Comment on § 1981, supra, 15 Harv.C.R.-C.L.L.Rev. at 106, 201 n.1.

### B. § 1983 Claims

The § 1983 claims must be dismissed because they operate only against the United States. 373 U.S. at 621 83 S.Ct. at 1007. As plaintiffs concede,[135/] the United States is not subject to suit under § 1983. Cannon v. University of Chicago, 441 U.S. 677, 700 n.27, 99 S.Ct. 1946, 1959 n.27, 60 L.Ed.2d 560 (1979) (dictum); see Smallwood v. U.S., 358 F.Supp. 398, 405 (E.D.Mo. 1973), aff'd without opinion 486 F.2d 1407 (8th Cir. 1973).

### C. Title VI Claims

Plaintiffs' Title VI claims must be dismissed. Title VI does not authorize private suits against the United States, Cabinet departments, or federal agency officials. Drayden v. Needville Independent School Dist., 642 F.2d 129, 133 n.6 (5th Cir. 1981); Craft v. Board of Trustees, 516 F.Supp. 1317, 1327 (N.D.Ill. 1981).

///
///

## D. Title VII Claims

The United States, the Interior Department and the Interior Secretary are entitled to summary judgment on the Title VII claims. When properly filed against the head of the employing federal agency,[136]/Title VII employment discrimination claims against the federal government are within the Court's jurisdiction. The problem is that the discrimination alleged here is discrimination in Trust Territory government employment. The Trust Territory government is an entity which is subordinate to but distinct from the United States government. See Part IV-B, supra. Defendants are entitled to summary judgment as a matter of law.

///
///
///
///
///
///
///
///
///
///
///
///
///
///
///

VII. TRUST TERRITORY CODE BILL OF
 RIGHTS EQUAL PROTECTION CLAIMS

 A. Claims Against the Trust
 Territory Government and
 the High Commissioner

The Court determines that it has subject matter jurisdiction over plaintiffs' claims against the Trust Territory government and the High Commissioner under the equal protection clause of the Trust Territory Bill of Rights (1 T.T.C. § 7).[137/] Under Covenant § 505, § 7 applies in the NMI so long as it is consistent with the United States Constitution, the Covenant, other federal laws and subsequent action by the NMI Legislature. See note 38, supra. The Trust Territory government and the High Commissioner have not attempted to argue that § 7 is inapplicable.[138/] Section 7 is functionally equivalent to the NMI Constitution's Equal Protection Clause in that it complements the federal constitutional equal protection guarantees which also operate against territorial governments. Because § 7 harmonizes with federal and NMI law, it remains applicable in the NMI. The Court accordingly denies the dismissal and summary judgment motions by the Trust Territory government and the High Commissioner.

///
///
/// ·
///
///
///

514

B. Claims Against the United
 States, the Interior
 Department and the Interior
 Secretary

Section 7 does not afford protection against the United States government. A contrary argument might have been plausible during the era in which there was no territorial legislature. This argument would have had to overcome authority indicating that territorial laws enacted by Congress itself or under congressional delegation are laws of the territory rather than laws of the United States. See Part V-C , supra. The reenactment of § 7 by the Congress of Micronesia reinforces the Court's conclusion that § 7 is not a restraint upon the United States government. The § 7 claims against the United States and the Interior defendants therefore are dismissed for lack of subject matter jurisdiction.

///
///
///
///
///
///
///
///
///
///
///

515

## VIII. CONCLUSION

For the reasons stated above, the Court rules as follows on defendants' motions:

1. **Motions by the Trust Territory government and the High Commissioner:**

 The Court denies defendants' dismissal and summary judgment motions with respect to plaintiffs' Trusteeship Agreement, § 1981, and § 1983 claims. The Court grants defendants' motion to dismiss plaintiffs' Title VI and Title VII claims for lack of subject matter jurisdiction.

2. **Motions by the United States, the Interior Department and the Interior Secretary:**

 The Court grants defendants' motions to dismiss the monetary Trusteeship Agreement claims, § 1981 claims, § 1983 claims, Title VI claims, and Trust Territory Code Bill of Rights equal protection claims. The Court denies dismissal and grants summary judgment to defendants on plaintiffs' Title VII claims. The Court denies defendants' dismissal and summary judgment motions as to plaintiffs' non-monetary Trusteeship Agreement claims.

No later than 4:30 p.m. on April 29, 1983, the parties shall individually file written statements with the Court proposing a date for the commencement of evidentiary hearings on class certification.

_March 22, 1983_
Date

_Alfred Laureta_
ALFRED LAURETA
United States District Judge

516

1/
 Trusteeship Agreement for the Former Japanese Mandated Islands, July 18, 1947, 61 Stat. 3301, T.I.A.S. No. 1665.

2/
 United Nations Charter, June 26, 1945, 59 Stat. 1031, T.S. No. 993.

3/
 Executive Order No. 119 continued and revised pay scales adopted in previous executive orders which were in accordance with Trust Territory Public Law NO. 6-65 (1975). Public Law No. 6-65 continued authority originally conferred by Public Law No. 4C-49, 61 T.T.C. § 10(1)(1972). The High Commissioner issued Order 119 pursuant to authority claimed under Interior Department Secretarial Order No. 3039, 44 Fed.Reg. 28116 (1979). The stated purpose of Order 3039 is to maximize and to ensure self-government by the Federated States of Micronesia, the Republic of Palau and the Republic of the Marshall Islands pending termination of the Trusteeship Agreement. Section 3.a.(8) of Order 3039 indicates that the High Commissioner may "hire such professional and administrative staff as may be necessary to carry out his duties and responsibilities and to organize the Office of High Commissioner so as to enable him to effectively carry out those responsibilities."

4/
 The Trust Territory government's disparate pay scales have been controversial for many years. See generally D. McHenry, Micronesia: Trust Betrayed, 235, 238 (1975)(appending executive agency report); Mink, Micronesia: Our Bungled Trust, 6 Tex. Int'l L.J. 181, 187 (1971).

5/
 Although neither the original Complaint nor the First Amended Complaint specifies whether plaintiffs sue the High Commissioner and the Interior Secretary officially or individually, the Court concludes that plaintiffs sue the defendant officers only in their official capacities. The test is whether a monetary judgment would be paid from the officers' personal funds or by the Trust Territory or United States governments. See Stafford v. Briggs, 444 U.S. 527, 542 n.10, 100 S.Ct. 774, 784 n.10, 63 L.Ed.2d 1 (1980). Plaintiffs allege pay scale discrimination pursuant to an established governmental policy.

First Amended Complaint, paragraphs 12-13. Thus, a back pay award redressing that policy would operate against either the Trust Territory or the United States. For these reasons, the Court construes the complaint as directed against the defendant officers only in their official capacities. This conclusion makes it unnecessary to decide whether plaintiffs have satisfied venue and process service requirements for an individual capacity suit against the officers.

6/
 Although plaintiffs have moved for class certification, the Court suspended certification proceedings during the pendency of defendants' dismissal and summary judgment motions. The pre-certification disposition of these motions is particularly appropriate in an employment discrimination class action because it facilitates the determination of the proper scope of judicial inquiry. Garcia v. Rush-Presbyterian-St. Luke's Medical Center, 80 F.R.D. 254, 260 [N.D.Ill. 1980].

7/
 The Court's use of the term "Micronesian" in this decision is a concession to literary convenience which does not foreshadow a grant of plaintiffs' motion to certify the class. One of defendants' professed grounds for denying class certification is that the term lacks definitional precision. The use of the term here comports with prior employment of the words "Micronesia" and "Micronesian" by courts and the executive branch to respectively denote the geographic area and the indigenous people of the Trust Territory. See, e.g., Gale v. Andrus, 643 F.2d 826, 828, 831 (D.C.Cir. 1980); Ralpho v. Bell, 569 F.2d 607, 612-613 and n.9, reh.denied 569 F.2d 636 (D.C.Cir. 1977); People of Saipan v. United States Department of the Interior, 502 F.2d 90, 93 (9th Cir. 1974), cert. denied 420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761 (1975); Commonwealth of the Northern Mariana Islands: Hearing on H.J. Res. 549 Before the United States Senate Committee on Foreign Relations, 94th Cong. 1st Sess. 183 (1975)(Senate Foreign Relations Committee Hearing on H.J.Res. 549)(Secretary of Defense Schlesinger). Defendants themselves employ the terms "Micronesia" and "Trust Territory" as synonyms. See Defendants' Joint Opening Memorandum In Support Of Original Motions at 2, lines 25-27; Trust Territory and High Commissioner's Reply Memorandum at 5, line 3.

8/
 The United States and the Interior defendants erroneously argue that plaintiffs allege only national origin discrimination. Under the review standards which govern these motions, the Court must construe the complaint in plaintiffs' favor. See Part II, infra. When so interpreted, the complaint satisfactorily albeit

inartfully alleges both racial and national origin discrimination. First Amended Complaint, paragraphs 3, 5, 12, 13.

9/
 Neither plaintiffs' First Amended Complaint, their motion memoranda nor their oral arguments suggest that they assert Charter rights other than rights under Articles 73a, 76b, and 76c, which delineate basic trusteeship responsibilities. See note 10. Because the Trusteeship Agreement subsumes and amplifies these responsibilities, this case does not present the question of whether the Charter alone is independently enforceable. See People of Saipan, 502 F.2d at 97.

10/
 The original Complaint under § 1983 alleged violations of the Trusteeship Agreement, the United Nations Charter, and the federal constitutional provisions and statutes cited in the text. It did not specify which Trusteeship Agreement or Charter articles were allegedly violated. The First Amended Complaint under § 1983 re-alleged as Count I the original Complaint's federal law causes of action, including averments of non-specific Trusteeship Agreement and United Nations Charter violations. It added as Count II: (1) specific references to Trusteeship Agreement Article 6.3 and United Nations Charter Articles 73a, 76b, and 76c; and (2) the Trust Territory Bill of Rights Claims summarized above. The thrust of Count II is that defendants have violated their own statutes and regulations.

11/
 The Trust Territory and the High Commissioner object on grounds of relevancy and hearsay to appendices attached to plaintiff Manglona's affidavit, which plaintiffs annex to their opposition to defendants' original motions. The appendices consist of letters and memoranda written by the affiant, two letters addressed to and received by the affiant, and a newspaper article. The objection is overruled as to all letters and memoranda and sustained as to the newspaper article.

 Paragraphs four and five of the sworn affidavit authenticate the letters and memorandum on facts within the affiant's personal knowledge. Thus, they satisfy Rule 56(e)'s requirements. See, e.g., U.S. v. Dibble, 429 F.2d 598, 601-602 (9th Cir. 1970); 10 Wright & Miller, Federal Practice & Procedure: Civil § 2777 at 485-486 (1973). This material documents the affiant's attempts to obtain redress from the High Commissioner and other federal officials. These unsuccessful attempts are facts of consequence to the disposition of plaintiffs' Trusteeship Agreement claims against the United States and the Interior defendants. The

letters and memoranda tend to make those facts more probable than they would be without the letters and memoranda. Under Federal Rule of Evidence 401 they are relevant.

The letters and memoranda are not hearsay. Hearsay is a statement, other than one made by the defendant under oath at a trial or hearing, offered to prove the truth of the statement's content. Anderson v. U.S., 417 U.S. 211, 220 n.8, 94 S.Ct. 2253, 2260 n.8, 41 L.Ed.2d 20 (1974). Plaintiffs offer the letters and memoranda to demonstrate attempts to secure administrative relief rather than to prove the truth of the documents' content. See Plaintiffs' Memorandum Opposing Defendants' Original Motions at 8. Moreover, two of the letters are replies to plaintiff Manglona from Interior Department and Health, Education and Welfare Department officials. Under Federal Rule of Evidence 801(d)(2)(A) and (D), these reply letters are non-hearsay admissions by a party opponent. See Aumiller v. University of Delaware, 434 F.Supp. 1273, 1290 (D.Delaware 1977).

Plaintiffs apparently offer the newspaper article solely for the truth of its content. It must be excluded because it consists of unexcepted hearsay.

12/
The NMI has chosen formal political union with the United States through the Covenant-based commonwealth status referred to in the text. The Caroline Islands and the Marshall Islands are now politically denominated as the Federated States of Micronesia, the Republic of Palau and the Republic of the Marshall Islands. These newly emerged states have elected the more autonomous status of free association, which does not involve political union with the United States. See generally McHenry, supra, note 4, at 99-101, 116, 131, 144-146, 168-169, 179-180, 183-184 ; Armstrong, Strategic Underpinnings of the Regime of Free Association: The Negotiations for the Future Political Status of Micronesia, 7 Brooklyn Int'l L.J. 179 (1981)(Armstrong); Clark, Self-Determination and Free Association Should the United Nations Terminate the Pacific Islands Trust?, 21 Harv. Int'l L.J. 1 (1981) (Clark); Green, Termination of the Pacific Islands Trusteeship, 9 Tex. Int'l L.J. 175, 180-196 (1974); Note, Self-Determination and Security in the Pacific: A Study of the Covenant Between the United States and the Northern Mariana Islands, 9 N.Y.U. J. Int'l L. Pol. 277, 288-301 (1976).

13/
Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America, Pub.L.No. 94-241, 90 Stat. 263, reprinted in 48 U.S.C. § 1681 note (1976).

14/

 See also note 16, infra.

15/

 The United Nations Trusteeship system has its primary roots in the post-World War I League of Nations mandates system and in nineteenth century European agreements for the administration of West Africa. See generally J. McNeill, The Strategic Trust Territory in International Law 86-169, 470-473 (doctoral thesis reproduced by University Microfilms Interational, 1976); J. Murray, The United Nations Trusteeship System 7-22, 239-241 (1957). A "strategic" trusteeship differs from a "non-strategic" trusteeship in that the Security Council exercises the United Nations' supervisory functions. H. Kelsen, The Law of the United Nations 649-651 (1966); Murray, supra, at 77. The United States retains veto power in the Security Council. See People of Saipan. 502 F.2d at 97 n.9. The United Nations Charter's distinction between "strategic" and "non-strategic" trusteeships originated in United States policy as a compromise between military proposals for the annexation of former Japanese-controlled Pacific Islands and State Department proposals for the international management of non-self-governing areas. See generally McHenry, supra note 4 at 32; McNeill, supra, at 20-44; Murray, supra, at 24-30; Green, America's Strategic Trusteeship Dilemma - Its Humanitarian Obligations , 9 Tex. Int'l L.J. 19, 26-33 (1974).

16/

 Congress, the executive branch, the United Nations Security Council and commentators have expressed uncertainty about the precise locus of sovereignty in the Trust Territory. See generally Trusteeship Agreement For The Territory Of The Pacific Islands: Hearing on S.J.Res. 143 Before the United States Senate Committee on Foreign Relations, 80th Cong. 1st Sess. 8, 16-17, 21-22 (1947) (Senate Hearing on S.J.Res. 143); 2 U.N. SCOR (16th mtg.) at 467-468, 471-472, 477-478 (1947); J. Brierly, The Law of Nations 188-189 (1963); Kelsen, supra note 15, at 688-694; Sayre, Legal Problems Arising From The United Nations Trusteeship System, 42 Am.J.Int'l L. 263, 268-272 (1948); Note, A Macrostudy of Micronesia: The Ending of a Trusteeship, 1972 N.Y.L.F. 139, 148-149, 204-207 (1972) (A Macrostudy of Micronesia); Note, Trusteeship Compared With Mandate, 49 Mich.L.Rev. 1199, 1204-1208, 1210 (1951).

 Under Trusteeship Agreement Article 6.1, the United States must promote the development of the Trust Territory's inhabitants toward self-government or independence in accordance with their freely expressed wishes. Note 2, infra. The fulfillment of that obligation is the most fundamental responsibility imposed by the Trusteeship Agreement. See Gale, 643 F.2d at 830; Northern Mariana Islands: Hearing on H.J.Res. 549 Before the Subcommittee

on General Legislation òf the United States Senate Committee on
Armed Services, 94th Cong. lst Sess. 152 (1975)(Senate General
Legislation Subcommittee Hearing on H.J.Res. 549)(joint statement
of executive branch officials in response to a question by
Senator Hart); Murray, supra note 5, at 211, 239-240. Therefore,
the conclusion most congruent with the Trusteeship Agreement is
that sovereignty is held in trust and ultimately reposes in the
Trust Territory's inhabitants rather than in the United States,
its Trust Territory government or the United Nations. Porter v.
U.S., 496 F.2d 583, 588 n.4 (Ct.Cl. 1974), cert.denied 420 U.S.
1004, 95 S.Ct. 1446, 43 L.Ed.2d 761 (1975); see Constitution of
the Federated States of Micronesia, Preamble, reprinted in Vol.
2, Trust Territory Code (1980 ed. Michie Co.)(1980 Code), at 309
and in Senate General Legislation Subcommittee Hearing on H.J.Res.
549, supra, at 162; Constitution of the Republic of Palau,
Preamble, reprinted in 1980 Code at 425; Constitution of the
Marshall Islands, Preamble, reprinted in 1980 Code at 373 (declaring
the "inherent sovereignty" or "inherent rights" of the Federated
States of Micronesia, the Republic of Palau and the Republic of
the Marshall Islands); Armstrong, supra note 12, at 186 and n.14,
197, 200-202 (concluding the peoples of the Trust Territory can
vest sovereignty in their newly formed constitutional governments).

17/
 See also Callas v. United States, 253 F.2d 838, 841 (2d Cir.
1958)(Hincks, Circuit Judge, concurring), cert.denied 357 U.S.
936, 78 S.Ct. 1384, 2 L.Ed.2d 1550 (1958)(concluding that the
United States has assumed "a fiduciary responsibility to the
United Nations... through an express trust agreement"); People of
Saipan v. United States Department of the Interior, 356 F.Supp.
645, 660 (D.Haw. 1973)(describing as "apt" the analogy between
the United States' trust responsibility to Micronesians and the
United States' fiduciary relationship with Indians, but refusing
to apply concomitant fiduciary principles on the ground repudiated
on appeal by the Ninth Circuit - that the Trusteeship Agreement
is not judicially enforceable); McNeill, supra, note 15, at 118-119
(describing the United States' fiduciary relationship with Indians
as "by far the classic illustration" employed to trace the roots
of the League of Nations' mandates system upon which the present
trusteeship system is based, but questioning the appropriateness
of supporting the analogy on the basis of Cherokee Nation v.
Georgia, 30 U.S. (5 Pet.) 1, 8 L.Ed. 25 (1831), in which the court
invoked trust doctrines to prevent rather than facilitate the
protection of Indian rights). Because the United States and its
Trust Territory government have duties under the Trusteeship Agree-
ment to act for the benefit of Micronesians, they stand in a
fiduciary relationship with Micronesians. See Restatement, Second,
Trusts § 2, comment b (1959).

18/
 The Trusteeship Agreement was drafted by the State, War and
Navy Departments with the assistance of the Joint Chiefs of
Staff. S.Rep.No. 471, 80th Cong. 1st Sess. 3 (1947); H.R.Rep.No.
889, 80th Cong. 1st Sess. 3, reprinted in 1947 U.S.Cong.Serv. 1317,
1319. The Security Council approved the instrument with three
minor amendments. See generally McNeill, supra note 15, at 214-217,
225-226, 228; Robbins, United Nations Trusteeship For The Territory
of the Pacific Islands, Department of State Bulletin 788-789 (May
4, 1947).

19/
 Trusteeship Agreement Article 3 states:

 (The United States) shall have full powers
 of administration, legislation, and juris-
 diction over the territory subject to the
 provisions of this agreement, and may apply
 to the trust territory, subject to any
 modifications which the (United States) may
 consider desirable, such of the laws of the
 United States as it may deem appropriate to
 local conditions and requirements.

20/
 See Part IV-A-2, infra. Ralpho v. Bell identified the
constitutional source of congressional authority to legislate
for the Trust as Article IV, Section 3, Clause 2 (the Territorial
Clause). See 569 F.2d at 618. As Ralpho recognized, Congress'
power under the Territorial Clause extends to areas over which
the United States lacks de jure sovereignty. See Vermilya-Brown
Co. v. Connell, 335 U.S. 377, 381, 69 S.Ct. 140, 142-143, 93
L.Ed. 76 (1948) reh.denied 336 U.S. 928, 69 S.Ct. 652, 93 L.Ed.
1089 (1949). Commentary has alternatively suggested that the
constitutional basis of Congress' legislative authority over the
Trust Territory is Article I, Section 8, Clause 18 (the Necessary
and Proper Clause). See Note, Executive Authority Concerning
The Future Political Status of the Trust Territory of the Pacific
Islands, 66 Mich. L.Rev. 1277, 1281 n.6 (1968).

21/
 Executive Order No. 11021, 27 Fed.Reg. 4409 (1962).

22/
 The Interior Secretary appointed both the High Commissioner
and the High Court until 1967. Since 1967 the High Commissioner
has been appointed by the President and confirmed by the Senate
pursuant to 48 U.S.C. § 1681a. The Interior Secretary still retains
the power to appoint the High Court.

523

26/
As early as 1950 the NMI expressed the desire for permanent political union with the United States. See S.Rep.No. 433, supra note 24, at 45. See also id. at 137-158; Northern Mariana Islands: Hearing on S.J.Res. 107 Before the United States Senate Committee on Interior and Insular Affairs, 94th Cong. 1st Sess. 251-253 (1975)(Senate Hearing on S.J.Res. 107)(Mariana Islands District Legislature resolutions endorsing political association with the United States).

27/
The people of the NMI approved the Covenant by a 78.8 percent vote in a plebiscite conducted on June 17, 1975. See generally S.Rep.No. 433, supra note 24, at 63-64; id. at 413-414 (letter to President Ford from the United States' Plebiscite Commissioner).

28/
See generally Branch, Constitution of the Northern Mariana Islands: Does A Different Cultural Setting Justify A Different Constitutional Standard?, 9 Denver J. Int'l L. Pol'y 35 (1980); Willens & Siemer, Constitution of the Northern Mariana Islands: Constitutional Principles and Innovation in a Pacific Setting, 65 Georgetown L.J. 1373 (1977).

29/
See note 35, infra.

30/
See note 45, infra.

31/
See note 116, infra.

32/
See note 89, infra.

33/
The Trust Territory government's headquarters was located in Hawaii between 1947 and 1954 and in Guam from 1954 to 1962. See S.Rep. No. 433, supra, note 24, at 29; A Macrostudy of Micronesia, supra note 16, 18 N.Y.L.F. at 150. When the Interior Department assumed jurisdiction over Saipan from the United States Navy in 1962, the Trust Territory government established its headquarters there. Van Cleve, supra note 25, at 140 n. According to Van Cleve who once directed the Interior Department's former Office of Territorial Affairs, Saipan technically has always been a "provisional" capital because in 1952 President Truman designated Dublon in the Caroline Islands atoll of Truk as the official territorial capital. Id..

34/

. Defendants' arguments on other issues include the assertion that federal legislation must specifically name the Trust Territory government in order to apply to or affect the Trust Territory government. Although defendants have not expressly advanced this contention as to the Covenant's judiciary provisions and implementing legislation, the Court has considered the contention with reference to those statutes and rejected it for the same reasons elaborated in Part V-B-1 (a), infra.

35/

Covenant § 402(a) and its implementary counterpart 48 U.S.C. § 1694a(a) state that the District Court for the NMI:

> shall have the jurisdiction of a district court of the United States. Except that in all causes arising under the Constitution, treaties, or laws of the United States, it will have jurisdiction regardless of the sum or value of the matter in controversy.

36/

The District Court for the NMI was created by Congress pursuant to its authority to regulate territories under Article IV, Section 3, Clause 2 of the United States Constitution. See generally Camacho v. Civil Service Commission, 666 F.2d 1257, 1260-1261 (9th Cir. 1982); Sablan v. Santos, 634 F.2d 1153, 1155 (9th Cir. 1980).

37/

See, e.g., S.Rep.No. 433, supra note 24; Marianas Political Status Commission, Section-By-Section Analysis of the Covenant to Establish a Commonwealth of the Northern Mariana Islands (MPSC Analysis) 26 (1975), reprinted in Senate Hearing on S.J.Res. 107, supra note 26, at 384; Vol. I, Briefing Papers For The Delegates To The Northern Marianas Constitutional Convention 21 n.22 (Office of Transition Studies and Planning, NMI Government, 1976).

38/

Covenant § 505 became effective on January 9, 1978 pursuant to the presidential proclamation mandated by § 1003(b). It states:

> The laws of the Trust Territory of the Pacific Islands, of the Mariana Islands District and its local municipalities, and all other Executive and District

526

> orders of a local nature applicable to
> the Northern Mariana Islands on the
> effective date of this Section and not
> inconsistent with this Covenant or with
> those other provisions of the Constitu-
> tion, treaties or laws of the United
> States applicable to the Northern
> Mariana Islands will remain in force
> and effect until and unless altered by
> the Government of the Northern Mariana
> Islands (emphasis added).

39/
　　The Covenant's legislative history largely characterizes the
Covenant as a "statute" or a "Federal Relations Act" rather than
as an international agreement. See, e.g., S.Rep.No. 433, supra
note 24, at 91; MPSC Analysis 128, reprinted in Senate Hearing on
S.J.Res. 107, supra note 26, at 486; Senate Foreign Relations
Committee Hearing on H.J.Res. 549, supra note 7, at 64-65 (testi-
mony by Deputy Secretary of State Ingersoll). Yet, commentary
suggests that the Covenant's approval by both houses of Congress
merely "finesses" the question of whether it is actually a
treaty or an international agreement. See Clark, supra note 12,
21 Harv. Int'l L.J. at 14-15 n.72, 18 n.93, 32-33 n.197. The
instant motions do not necessitate a definitive statement on the
Covenant's precise legal status. The major issue here is the
suppression and control of the Trust Territory government's
authority by the Covenant's provisions concerning judicial power
and applicable federal laws. For purposes of resolving that
issue, the Court does "not think that the distinction between a
treaty and a statute has great significance." Blake v. Arnett,
663 F.2d 906, 909 (9th Cir. 1981).

40/
　　Congressional committee reports are among the most persuasive
indicia of legislative intent. Housing Authority of Omaha v. U.S.
Housing Authority, 468 F.2d 1, 7 n.7 (10th Cir. 1972), cert.denied
410 U.S. 927, 93 S.Ct. 1360, 35 L.Ed.2d 588 (1973). They accord-
ingly receive greater weight in statutory analysis than less
formal legislative history material. I.T.T. Corp. v. Gen. Tel. &
Elect. Corp., 518 F.2d 913, 921 (9th Cir. 1975); see United States
v. International Union, Etc., 352 U.S. 567, 585, 77 S.Ct. 529,
538, 1 L.Ed.2d 563 (1957).

41/
　　Senate General Legislation Subcommittee Hearings on H.J.Res.
549, supra note 16; Senate Foreign Relations Committee Hearing on
H.J.Res. 549, supra note 7; Senate Hearing on S.J.Res. 107, supra

527

note 26; Marianas Political Status: Hearing Before the Subcommittee on Territorial and Insular Affairs, House of Representatives Committee on Interior and Insular Affairs, 94th Cong. 1st Sess. (1975); S.Rep. No. 596, 94th Cong.2d Sess. (1976) reprinted in 1976 U.S. Code Cong. & Ad. News 448; S.Rep. No. 433, supra note 24; H.R.Rep. No. 364, 94th Cong. 1st Sess. (1975); 122 Cong. Rec. 3341-3342; 3588-3589, 3775, 3795-3796, 4187-4232, 7272-7273 (1976); 121 Cong.Rec. 6977-6984, 6993-7002, 23399-23402, 23662-23673, 33654-33655 (1975); 120 Cong.Rec. 18266 (1974).

42/
Title 6 T.T.C. § 357 (1970); Van Cleve, supra note 25, at 137. But cf. King v. Morton, 520 F.2d 1140, 1143 and n.3 (D.C.Cir. 1977) (reserving the question of whether the United States Supreme Court has appellate jurisdiction over Samoan court decisions notwithstanding 15 Am.Samoa Code § 5104 (1973), which states that decisions by the Appellate Division of the High Court of American Samoa are final.

43/
Section 4 of the Northern Mariana Islands Constitution's Schedule on Transitional Matters, reprinted in Willens & Seimer, supra note 28, at 1479, states in applicable section:

> Civil and criminal matters pending before
> the High Court of the Trust Territory of
> the Pacific Islands on the effective date
> of the Constitution that involve matters
> within the jurisdiction of the Commonwealth
> Trial Court of (sic) the United States
> District Court for the Northern Mariana
> Islands shall remain within the jurisdiction
> of the High Court until finally decided.

This case indisputably is beyond the High Court's § 4 jurisdiction. First, this action was not pending before the High Court on the NMI Constitution's operative date. Plaintiffs filed their original complaint in 1981, more than three years after that date. Second, with the exception of plaintiffs' equal protection claims under the Trust Territory Bill of Rights, this case arises exclusively under federal law.

44/
The NMI Constitutional Convention adopted § 4 on December 1, 1976. On that date the delegates weighed alternative jurisdictional arrangements to be implemented in the event a federal district court was not available on the constitution's effective date to exercise jurisdiction of local law actions as allowed by the Covenant and as defined in Acticle IV of the draft NMI Constitution.

Within the context of the following discussion occurred between a delegate and the convention's legal consultant:

> Delegate Ramon Villagomez: Do you know if we can after the effective date of the Constitution continue to file cases in the High Court of the Trust Territory?
>
> Mr. Willens: I would think not, as it is presently written. Cases arising after the effective date of the Constitution would have to be filed either in the Commonwealth Trial Court or the U.S. District Court.
>
> Delegate Ramon Villagomez: Would the Trust Territory High Court not be sitting on Saipan?
>
> Mr. Willens: That would be, obviously, up to that court. I expect that that court would remain here but that, along with other government institutions in the Trust Territory, it might at some point leave Saipan for one of the other districts. I don't think there is anyway we could insure that the Trust Territory courts would be open to your cases. It might be possible to provide here that if no U.S. District Court is provided, that would be available as an alternative for you (emphasis added).

Vol. I, Journal of the Northern Mariana Islands Constitutional Convention of 1976 256 (1976). The convention then adopted § 4 without incorporating the suggested provision for contingent High Court jurisdiction. Id. at 258. The legal consultant had previously recommended that Article IV should provide that "the legislation will have the authority to give the Commonwealth Trial Court all jurisdiction" if a federal district court was unavailable. Id. at 255 (emphasis in original). Sections 2 and 3 of Artcile IV contain language to that effect. See Willens & Seimer, supra note 28, at 1471. See generally Analysis of the Constitution of the Northern Mariana Islands 105, 107 (1976), adopted by Res.No. 16, Northern Mariana Islands Constitutional Convention (1976).

45/
 Covenant § 402(b) describes the local law trial jurisdiction of the District Court for the NMI. Section 1694a(b) implements § 402(b). These statutes provide in relevant part:

> The district court shall have original
> jurisdiction in all causes in the Northern
> Mariana Islands not... [arising under
> federal law] jurisdiction over which is
> not vested by the Constitution or laws
> of the Northern Mariana Islands in a court
> or courts of the NMI.

46/
The Trust Territory also resisted subject matter juris-
diction in Sablan Construction on the ground that it is a foreign
state immune from suit in United States courts. 526 F.Supp. at
137-138. The Trust Territory has not urged the contention here.

47/
Neither this decision nor Sablan Construction suggests that
the characterization of the Trust Territory government's authority
as "delegated" United States authority also applies to the authority
of the locally constituted governments of the NMI and other
Micronesian areas.

48/
The enactment of Trust Territory organic legislation was
contemplated literally from the day the trusteeship began. See,
e.g., Public Statement of President Truman (July 18, 1947),
Appendix A to Plaintiffs' Memorandum Opposing Defendants' Renewed
Motions ("I have asked the Department of State to prepare, in
consultation with other interested Departments, suggestions for
organic legislation for the trust territory. It is expected that
these suggestions will be ready for presentation to the Congress
at its next session."). See also Note, Customs, Codes and Courts
in Micronesia, 5 Stan.L.Rev. 42, 48-53 (1952)(discussing Trust
Territory organic legislation introduced in Congress in 1952).

49/
Citing the Covenant's judiciary provisions and § 505, the
Trust Territory government advocated exactly this position in
the High Court within weeks after the NMI Constitution took
effect. See Mariana Islands Airport Authority v. Trust Territory
of the Pacific Islands, Civil Action No. 9-78, Order at 4-5
(H.C.Tr.Div. February 13, 1978), incorporated as Appendix A to
Response of Trust Territory and High Commissioner to Plaintiff's
Memorandum Opposing Defendants' Original Motions.

It is noteworthy but non-controlling that the High Court has
acknowledged its loss of NMI jurisdiction. In Sablan v. Sablan,
CV App. No. 331 (H.C.App.Div. 1980), the High Court's Appellate

Division vacated a 1979 Trial Division order which purported to enforce a 1977 Trial Division divorce decree rendered on Saipan. The court held that the High Court has no jurisdiction after the NMI Constitution's effective date to enforce its final judgments or to act on post judgment motions. Sablan at 2, 4. The court predicated its holding upon the rationale that the NMI remained with High Court jurisdiction only until that date. Id. at 2.

It is unclear whether Trusteeship Agreement claims would be cognizable in the High Court even if the High Court had NMI jurisdiction. Shortly after People of Saipan, the High Court criticized the Ninth Circuit's decision and probably reaffirmed its long-standing contrary view that the Trusteeship Agreement is not a trust capable of judicial enforcement. Trust Territory v. Lopez, 7 T.T.R. 449, 452-454 (H.C.App.Div. 1976) (semble). Commentary has persuasively questioned the High Court's position. See Olsen, Piercing Micronesia's Colonial Veil: Enewetak v. Laird and People of Saipan v. Department of Interior, 15 Columbia J. of Transnat'l L. 473, 477-490 (1976). Moreover, the NMI Commonwealth Trial Court has repudiated Lopez' interpretation of People of Saipan. See E.D.L.F. v. Inos, Civil Action No. 81-05 Order at 10-11 (C.T.C. Nov. 25, 1981(dictum).

50/
 See Hasbrouck v. Texaco, Inc., 663 F.2d 930, 933 (9th Cir. 1981), cert.denied ___ U.S. ___, ___ S.Ct. ___, 74 L.Ed.2d 65 (1982).

51/
 See, e.g., Harris v. Boreham, 233 F.2d 110, 113-116 (3d Cir. 1956)(Virgin Islands Municipality of St. Thomas & St. John). See also Report of the Drafting Committee on the Negotiating History of the Covenant C-2 (1975), reprinted in S.Rep.No. 433, supra note 24, at 404 (establishing the non-federal agency status of the NMI commonwealth).

52/
 See also People of Saipan, 502 F.2d at 94 n.1 (noting the Interior Department's traditional position that "territorial governments, under the jurisdiction of the Secretary of the Interior, are not agencies or instrumentalities of the executive branch of the Federal Government... [and] that the territorial governments are not organized entities of the Department of the Interior"); Porter, 496 F.2d at 589 (noting the Comptroller General's conclusion that "none of the territorial governments, including the Government of the Trust Territory, are regarded as federal agencies or instrumentalities"); Bell v. Commissioner of

Internal Revenue, 278 F.2d 100, 103 (4th Cir. 1960)(summarizing Interior Deparment policy); Interior Department Manual 575.1.1 (current regulation embodying the Interior Department's view that territorial governments are not executive branch agencies).

53/
 Even a private entity may be an agent of the United States for certain statutory purposes without being a component part of the United States government and without being specifically labeled as an "agent". See, e.g., Mitchell v. Occidental Insurance Medicare, 619 F.2d 28, 29-30 (9th Cir. 1980); Kuenstler v. Occid. Life Insurance Co., 292 F.Supp. 532, 534 (C.D.Calif. 1968)(42 U.S.C. § 1395u).

54/
 Note 21, supra.

55/
 People of Saipan, 502 F.2d at 98 n.10 ("the High Commissioner's authority does not come from the people of the Trust Territory'...")(citation omitted).

56/
 In addition to the Ninth Circuit authority discussed in the text, defendants rely upon Gale v. Andrus 643 F.2d at 830-833, Porter v. United States, 496 F.2d at 589-590, and Callas v. United States, 253 F.2d at 840-841. These three decisions do not bind judges in the Ninth Circuit. See note 103, infra. Gale held that for purposes of the Freedom of Information Act the Trust Territory government is an exempt United States territorial government rather than a federal agency covered by the statute. See note 97, infra. Porter turned upon contractual privity rather than statutory construction. The court decided that the Trust Territory government "is not an agency of the United States for contract purposes." 496 F.2d at 489. Callas held that the Trust Territory is a "foreign country" under a jurisdictional exception to the Federal Tort Claims Act. See also Kuhn v. United States, 541 F.Supp. 567, 568-569 (C.D.Calif. 1982); Brunell v. United States, 77 F.Supp. 68, 72 (S.D.N.Y. 1948)(dictum)(same conclusion). But see Sablan Construction, 516 F.Supp. at 138 n.8 (dictum questioning Brunell's present validity). Neither Gale, Porter nor Callas involved Trusteeship Agreement claims or held that the Trust Territory government is not "doing the work of the United States" (496 F.2d at 589) with respect to the fulfillment of Trusteeship Agreement obligations.

57/

McComish v. Commissioner of Internal Revenue, 580 F.2d 1323, 1330 (9th Cir. 1978); Sablan Construction, 526 F.Supp. at 140 n.16.

58/

Sablan Construction, 526 F.Supp. at 140-141 and nn.17-18; People of Saipan, 356 F.Supp. at 659; Calvo v. Trust Territory of the Pacific Islands, 4 T.T.R. 506, 512 (H.C.App.Div. 1969); Alig v. Trust Territory of the Pacific Islands, 3 T.T.R. 603, 615 (H.C.App.Div. 1967).

59/

Sablan Construction, 526 F.Supp. at 140.

60/

The Trust Territory has been held to be a "foreign country" under an exception to Federal Tort Claims Act jurisdiction. See note 56, supra. It has also been found to be a "foreign state" under the Immigration and Nationality Act. Application of Reyes, 140 F.Supp. 130, 131 (D.Haw. 1956). Yet, the Trust Territory is part of "the Nation" covered by the National Environmental Policy Act. People of Enewetak v. Laird, 353 F.Supp. 811, 819 (D.Haw. 1973). One court also has held that the Trust Territory is not a "foreign state" for federal diversity jurisdiction purposes. World Communications Corp. v. Micronesian Telecommunications Corp., 456 F.Supp. 1122, 1124 (D.Haw. 1978). In a federal constitutional case, a court determined that although the Trust Territory is not under United States sovereignty, it is "under United States control or possession such that it cannot be considered a foreign country." Thompson v. Kleppe, 424 F. Supp. 1263, 1267 (D.Haw. 1976); accord, People of Saipan, 356 F.Supp. at 655. During a Senate hearing on the Covenant, executive branch officials disclaimed that document's status as an international agreement on the ground that "[t]he Marianas are not a foreign country." Senate Foreign Relations Committee Hearing on H.J.Res. 549, supra note 7, at 65 (revised testimony by Deputy Secretary of State Ingersoll); accord, id. at 164 (written executive branch comment responding to Senator Hart's assertion that the Covenant is a treaty).

61/

During its thirteen years of existence the Congress of Micronesia lacked the power to enact legislation inconsistent with the Trusteeship Agreement or other applicable United States laws. See Gale, 643 F.2d at 830; McComish, 580 F.2d at 1329; People of Saipan, 502 F.2d at 99.

62/
 See also Commonwealth of Puerto Rico v. Alfred Snapp & Sons, 632 F.2d 365, 368-370 (4th Cir. 1980), aff'd ___ U.S. ___, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982)(recognizing the Commonwealth of Puerto Rico's parens patriae standing to represent its citizens in an action implicating its "quasi-sovereign" economic interests as an "integral political subdivision").

63/
 When § 1694a(a) was enacted in 1977, the predecessor of § 1331 [former 28 U.S.C. § 1331(a)] required a federal question jurisdictional minimum of more than $10,000 in controversy. Section 1694a(a) was specifically designed to avoid § 1331(a)'s amount in controversy requirement. When Congress excised the requirement and reenacted § 1331(a) as § 1331 in 1980, § 1694a(a)'s exemption became superfluous. See generally Bauer v. McCoy, CV 81-0019, Decision at 10-12 and n.21 (D.N.M.I. 1982).

64/
 In People of Saipan the Ninth Circuit described the Trustee-ship Agreement as a "treaty" and an "international agreement." 502 F.2d at 97. The issue there was the Trusteeship Agreement's judicial enforceability rather than its technical legal status as a "treaty" or an "international agreement", or other form of instrument. A treaty in the strict constitutional sense is an instrument approved by the Senate alone rather than by both houses of Congress. Weinberger v. Rossi, ___, U.S. ___, ___, 102 S.Ct. 1510, 1514, 71 L.Ed.2d 715 (1982). The Trusteeship Agreement was approved by both the Senate and the House of Representatives.

 Nevertheless, it is correct to characterize the Trusteeship Agreement as a "treaty" for purposes of § 1694a(a) federal question jurisdiction. In Altman v. U.S., 224 U.S. 583, 601, 32 S.Ct. 593, 597, 56 L.Ed. 894 (1912), the Supreme Court held that an international agreement approved by both houses of Congress was a "treaty" under a statute defining the Supreme Court's appellate jurisdiction. Neither the language nor the legislative history of § 1694a(a) indicates that its reference to "treaties" should be less flexibly construed than the reference in the Altman statute.

 Of course, Congress has not imparted a precise meaning to the word "treaty". Weinberger, ___ U.S. at ___, 102 S.Ct. at 1515. Words have different shades of meaning, and the meaning intended in a particular statute depends upon the statute's purposes and the circumstances and context in which its language is employed, rather than merely upon a consideration of the language alone. District of Columbia v. Carter, 409 U.S. 418, 420, 93 S.Ct. 602,

604, 34 L.Ed.2d 613, reh. denied 410 U.S. 959, 93 S.Ct. 1411, 35 L.Ed.2d 694 (1973). Thus, the question of whether the Trusteeship Agreement is a "treaty" for purposes of other statutes necessarily turns upon both the purposes of the particular legislation and whether the Trusteeship Agreement is the type of instrument contemplated by the legislation.

65/
 Plaintiffs' monetary Trusteeship Agreement claims against the Trust Territory government probably would be within § 1694a(a) jurisdiction even if that government were a component part of the United States government. In Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963), Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949), and Land v. Dollar, 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947), the Supreme Court developed the principle that a suit against a federal officer is barred as a suit against the United States if recovery would come from the public treasury. In suits brought against the Federal Housing Administration pursuant to 12 U.S.C. § 1702, the Dugan-Larson doctrine has not barred recovery against "funds in the possession and control of the agency." See generally Marcus Garvey Square v. Winston Burnett Const., 595 F.2d 1126, 1131 (9th Cir. 1979). The Trust Territory government maintains its own treasury. Moreover, the "well known rule" is that "funds appropriated to the Department of the Interior as grants to the Trust Territory lose their character as federal funds when paid over and mingled with Trust Territory Government local revenues." Trust Territory Attorney General's Opinion 67-2 at 3 (Nov. 1, 1967).

66/
 See Alig v. Trust Territory of the Pacific Islands, 3 T.T.R. 603, 610-615 (H.C.App.Div. 1967).

67/
 Bauer, supra note 63, Decision at 24 n.49; People of Saipan, 356 F.Supp. at 659.

68/
 Kawananakoa was the primary authority invoked by the High Court when it announced the doctrine of Trust Territory government immunity. See Alig, 3 T.T.R. at 610-611.

69/
 Trusteeship Agreement Article 6.3 states that the United
States shall:

 promote the social advancement of the
 inhabitants and to this end shall protect
 the rights and fundamental freedoms of
 all elements of the population without
 discrimination; protect the health of the
 inhabitants; control the traffic in arms
 and ammunition, opium and other dangerous
 drugs, and alcoholic and other spirituous
 beverages; and institute such other regu-
 lations as may be necessary to protect
 the inhabitants against social abuses...

70/
 As indicated in note 17, supra, the analogy between the
United States' fiduciary relationship with Micronesians and its
fiduciary relationship with Indians has received judicial and
scholarly recognition. Because the general interpretive principles
stated in the text suffice to dispose of the issue here, the
Court has no occasion to determine the extent to which canons of
construction applicable to Indian treaties also analogously apply
to the construction of the Trusteeship Agreement.

71/.
 During the United Nations Security Council's consideration
of the Trusteeship Agreement the United States recorded its view
that "the draft trusteeship agreement is in the nature of a
bilateral contract between the United States, on one hand, and
the Security Council on the other." 2 UN SCOR (116th mtg.) at 476
(1947).

72/
 Note 18, supra.

73/
 Title 1 T.T.C. § 103 incorporates the American Law Institute's
Restatements of the Law as Trust Territory common law. Section
103 remains part of NMI law pursuant to Covenant § 505, note 38,
supra.

74/
 Defendants have argued that government immunity principles bar plaintiffs' monetary Trusteeship Agreement claims. Because the Court dismisses for the reason stated above, it does not address this argument.

75/
 Kester v. Campbell, 652 F.2d 13, 15 (9th Cir. 1981), cert. denied ___ U.S. ___, 102 S.Ct. 1008, 71 L.Ed.2d 298 (1982).

76/
 Beale v. Blount, 461 F.2d 1133, 1138 (5th Cir. 1972); Johnson v. Hoffman, 424 F.Supp. 490, 492-493 (E.D.Mo. 1977), aff'd 572 F.2d 1219 (8th Cir. 1978), cert.denied, 439 U.S. 986, 99 S.Ct. 579, 58 L.Ed.2d 658 (1978).

77/
 Bauer, supra note 63, Decision at 6.

78/
 The Tucker Act [28 U.S.C. § 1346(a)(2)] states in relevant section:

 [D]istrict courts shall have original
 jurisdiction concurrent with the Court
 of Claims, of:

 any other civil action or claim
 against the United States, not
 exceeding $10,000 in amount,
 founded either upon the Consti-
 tution, or any Act of Congress,
 or any regulation of an executive
 department, or upon any express
 or implied contract with the
 United States . . .

The Trusteeship Agreement is an Act of Congress. 61 Stat. 3301. A monetary claim under it may be within § 1346(a)(2) jurisdiction unless other jurisdictional problems exist.

79/
 Title 5 U.S.C. § 701-706. Although plaintiffs do not invoke the APA, the Court may note any statute which suports jurisdiction. See Part II, supra. The APA itself is not a grant of subject matter jurisdiction. Califano v. Sanders, 430 U.S.

99, 105-107, 97 S.Ct. 980, 984-985, 51 L.Ed.2d 192 (1977). It merely removes the United States' immunity from suits for non-monetary relief brought under general jurisdictional statutes such as 28 U.S.C. § 1331 and 48 U.S.C. § 1694a(a). *See Andrus v. Charlestone Stone Prods. Co. Inc.*, 436 U.S. 604, 607 n.6, 98 S.Ct. 2002, 2005 n.6, 56 L.Ed.2d 570 (1978); 430 U.S. at 105-107, 97 S.Ct. at 984-985.

80/
 Title 5 U.S.C. § 702 states in relevant part:

> An action in a court of the United States
> seeking relief other than money damages
> and stating a claim that an agency or an
> officer or employee thereof acted or
> failed to act in an official capacity
> under color of legal authority shall not
> be dismissed nor relief therein shall be
> denied on the ground that it is against
> the United States or that the United
> States is an indispensable party. The
> United States may be named as a defendant
> in any such action and a judgment or
> decree may be entered against the United
> States...

81/
 *See generally* Schulthess v. United States, 694 F.2d 175, 177-179 (9th Cir. 1982); Beller v. Middendorf, 632 F.2d 788, 796-797 (1980), reh. denied 647 F.2d 80 (9th Cir. 1981), cert.denied, ___ U.S. ___, 101 S.Ct. 3030, L.Ed.2d 405 (1981); Glines v. Wade, 586 F.2d 675, 681 (9th Cir. 1978), rev'd on other grounds, 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980).

82/
 Affidavit of plaintiff Manglona, annexed to Plaintiffs' Opposition to Defendants' Original Motions, paragraphs 1, 3, 4, 6.

83/
 Id., paragraph 5.

84/
 The second letter is from the Principal Deputy of the Office of Civil Rights in the former Department of Health, Education and Welfare. This letter informs plaintiff that the Interior

538

Department has responsibility for persons in island territories
under United States administration and that therefore plaintiff's
complaint has been referred to the Interior Department's Office
for Equal Opportunity.

85/
 The Interior Department's former Office of Territorial
Affairs is now called the Office of Territorial and International
Affairs.

86/
 The Interior Department previously has manifested its aware-
ness that it has the authority to directly dictate the Trust
Territory government's employee pay scale policies. See S.Rep.No.
26 (May 21, 1971), reprinted in Journal of the Congress of Micro-
nesia, 4th Cong. 4th Special Sess. 155 (May 1971)(describing a
May 1969' "policy statement" by the Interior Secretary in which
the Secretary "promised that the Department of the Interior would
seek to implement a policy of equal pay for equal work"); Mink,
supra note 4, at 187 (same).

87/
 APA § 706(1) states:

> To the extent necessary to decision
> and when presented, the reviewing court
> shall decide all relevant questions of
> law, interpret constitutional and statu-
> tory provisions, and determine the
> meaning or applicability of the terms
> of an agency action. The reviewing
> court shall--
>
> (1) compel agency action unlawfully
> withheld or unreasonably delayed...

88/
 Laguna Honda differs from this case in that plaintiff there
did not initially pray for monetary relief against the United
States. Nevertheless, the principle stated in Laguna Honda
logically also applies when the district court first determines
that it lacks jurisdiction over asserted monetary claims.

89/
 Covenant § 502(a)(2) states in part:

539

The following laws of the United States in existence on the effective date of this Section and subsequent amendments to such laws will apply to the Northern Mariana Islands, except as otherwise provided in this Covenant:

(2) Those laws... which are applicable to Guam and which are of general application to the several States as they are applicable to the several States.

90/
See Covenant § 105, 503, 805. See also Covenant § 402(b) and § 403(b)(suggesting the inapplicability of federal laws which conflict with the Covenant's provisions concerning treatment of the District Court of the Northern Mariana Islands as a court of the Northern Mariana Islands for purposes of determining jury trial and grand jury indictment requirements).

91/
Plaintiffs do not concede that the NMI is the only place in which § 1981, § 1983, Title VI and Title VII apply to the Trust Territory government. Plaintiffs' Opposition Memorandum at 4.

92/
Because § 1981 applies in both States and Territories, it is unnecessary to decide whether the NMI Commonwealth is a "State" or a "Territory" under the statute. Cf. Examining Board of Engineers, Architects and Surveyors v. Flores de Otero, 426 U.S. 572, 597, 96 S.Ct. 2264, 2279, 49 L.Ed.2d 65 (1976)(stating the same principle concerning the Commonwealth of Puerto Rico's status as a "State" or a "Territory" for purposes of federal jurisdiction under 28 U.S.C. § 1343(3) to enforce 42 U.S.C. § 1983

93/
Note 19, supra.

94/
Plaintiff's Memorandum Opposing Defendants' Original Motions at 3.

95/
Defendants' Joint Memorandum Supporting Defendants' Original Motions at 10-14.

96/
 Title 5 U.S.C. § 552. The FOIA applies to "federal agencies"
as defined in § 551(1).

97/
 The issue in Gale was whether the Trust Territory government
is a federal agency which must comply with the FOIA. The majority
held that the Trust Territory government is not. 643 F.2d at
830-832. All three members of the Gale court agreed that even if
the Trust Territory is otherwise federal agency it is immune from
the FOIA pursuant to a specific exemption for the governments of
United States territories or possessions. Id. at 832-833; id. at
834 (Oberdorfer, District Judge, concurring in the result).

98/
 The majority found it "fully consistent to hold, as did the
United States District Court for Hawaii, that the laws of the
United States could apply to the Trust Territory only if Congress
expressly so provided in the statute." 643 F.2d at 834. The
district court decision to which the majority alluded was People
of Enewetak, 353 F.Supp. 811 (D.Haw. 1973).

99/
 People of Enewetak's statutory analysis properly began with
Trusteeship Agreement Article 3. 353 F.Supp. at 814-815, 817
n.12, 818-819. The United States Article 3 powers of administra-
tion, legislation and jurisdiction include the authority to apply
federal legislation to the Trust Territory. See note 19, supra.

 The court recognized four principles concerning the judicial
application of federal legislation to the Trust Territory pursuant
to Article 3. First, all federal laws do not necessarily or
automatically apply to the Trust Territory. 353 F.Supp. at 815.
Second, Congress must manifest an intention to include the Trust
Territory within a statute's coverage before a court applies the
statute to claims arising there. Id. Third, Congress usually
indicates this intention by including the Trust Territory within
a statute's definition of the term "State" or "United States".
Id. and n.8. A problem of statutory construction arises when, as
in People of Enewetak, the statute lacks a definitional section
specifying the particular area or entities which are to be consi-
dered a "State" or part of the "United States". In these circums-
tances a fourth principle applies. The court must determine and
effectuate Congress intent by investigating the fundamental
purposes, character and legislative history of the statute in
question. Id..

541

100/
.Title 42 U.S.C. § 4321 et seq.

101/
643 F.2d at 834.

102/
In People of Saipan, the district court similarly rejected the "specific inclusion" theory of statutory construction because it found the theory to be an unacceptably "mechanical rule." See 356 F.Supp. at 649-650.

103/
Although judges in the Ninth Circuit may seek guidance in decisions by other courts and district courts, they are bound only by Supreme Court and Ninth Circuit precedent. Gunther v. Washington County, 623 F.2d 1303, 1309 (9th Cir. 1979), aff'd 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981); see Villines v. Harris, 487 F.Supp. 1278, 1279 n.1 (D.N.J. 1980).

104/
See Gale, 643 F.2d at 832-833 (construing the Freedom of Information Act's exemption for the governments of United States territories and possessions in light of the legislative history of a similar exemption under the Administrative Procedure Act); McComish, 580 F.2d at 1324-1328 (construing an income exclusion provision in the Internal Revenue Code in light of the provision's basic purposes, its legislative history and its prior judicial interpretation); Groves v. U.S., 533 F.2d 1376, 1378-1386 (5th Cir. 1976), cert.denied 429 U.S. 1000, 97 S.Ct. 529, 50 L.Ed.2d 611 (1977)(construing the same statute as McComish under a similarly expensive analytical approach but reaching a contrary result); Sablan Construction, 526 F.Supp. at 138-140 and nn.13-14; 16-18 (construing 48 U.S.C. § 1694a(b) in light of 48 U.S.C. § 1681(a), the legislative history of § 1694a(b), and prior decisions concerning the authority of state and territorial governments); World Communications Corp. v. Micronesian Telecommunications Corp. 456 F.Supp. 1122, 1124-1125 (D.Haw. 1978) (construing 28 U.S.C. § 1352 in light of prior judicial decisions interpreting § 1332); cf. Melong v. Micronesian Claims Commission, 569 F.2d 630, 632-634 (D.C.Cir. 1977); Ralpho v. Bell, 569 F.2d at 616-628 (construing the Micronesian Claims Act in light of the Act's purposes, its legislative history, the interpretation of analogous statutory provisions, and the Trusteeship Agreement's human rights guarantees). But see Thompson v. Kleppe, 424 F.Supp. at 1265 (concluding without analysis that the Trust Territory is not a "State or Territory" under 42 U.S.C. § 1983).

105/
 Cf. Hooven & Allison Co. v. Evatt, 324 U.S. 652, 692-693, 65 S.Ct. 870, 889-890, 89 L.Ed. 1252, reh. denied 325 U.S. 892, 65 S.Ct. 1198, 89 L.Ed. 2004 (1945) (Murphy, J., concurring in part) (uging the adoption of the construction of Article I, Section 10, Clause 2 of the Constitution which best serves the United States' policy and legal obligation to move the post-war Philippines to independence and national reconstruction). See also Green, The Applicability of American Laws to Overseas Areas Controlled by the United States, 68 Harv.L.Rev. 781, 803 (1955) (suggesting the inapplicability of federal legislation which conflicts with United Nations Charter obligations to the Trust Territory's inhabitants).

106/
 Although the contemporaneous remarks of a single legislator or a bill's sponsor are not controlling [Consumer Product Safety Commission v. GTE Sylvania Inc., 447 U.S. 102, 118, 100 S.Ct. 2051, 2061, 64 L.Ed.2d 766 (1980)], a floor's manager statements are entitled to weight. In re Grand Jury Investigation of Cuisin- arts Inc., 665 F.2d 24, 34 (2d Cir. 1981). This is especially true where, as here, the statements reflect the views of a com- mittee. Cf. note 40, supra.

107/
 See generally Cincinnati Soap Co. v. United States, 301 U.S. 308, 314, 57 S.Ct. 764, 81 L.Ed. 1122 (1937)("the possession of this well-nigh absolute power over a dependent people carries with it great obligations... '[T]he obligations correlative to this great power are of the highest character and... it is our unquestioned duty to make the interests of the people over whom we assert sovereignty the first and controlling consideration in all legislation and administration which concerns them...' (cita- tion omitted)"; Reavis v. Fianza, 215 U.S. 16, 22-23, 30 S.Ct. 1, 2, 54 L.Ed 73 (1909)(stating that a provision in the Philippine Organic Act must be "supposed to have had in view the natives of the islands, and to have intended to do liberal justice to them"). Cariño v. Insular Government of the Philippine Islands, 212 U.S. 449, 458-460, 29 S.Ct. 334, 336, 53 L.Ed. 594 (1909) (in resolving ambiguities in Spanish law applicable in the Philippines prior to United States administration, "every presumption is and ought to be be against the government... [and courts] ought to give the... [indigenous people] the benefit of the doubt"); United States v. Fullard-Leo, 156 F.2d 756, 758 (9th Cir. 1946) (en banc), aff'd 331 U.S. 256, 272 67 S.Ct. 1287, 1294, 91 L.Ed. 1474 (1947)(applying Cariño's principle that legal ambiguities must be resolved in favor of insular people and against the government).

108/
 Secretarial Order 2989, 41 Fed.Reg. 15892 (1976), limited the taxing and regulatory authority of the NMI government during the interim between the Covenant's enactment and the inception of the Commonwealth government on January 9, 1978. See Order 2989, Part VII, § 2. When the supervening provisions of the Covenant and the NMI Constitution took effect in 1978, Order 2989 expired by operation of law as well as under its own terms. See Order 2989, Part XIV.

109/
 Acting on United States policy in 1970, the High Commissioner had openly discouraged the NMI's initiates for separate status negotiations. See S.Rep. No. 433, supra note 24, at 48. In accordance with his position as an executive branch subordinate, the High Commissioner similarly adhered to United States policy when the NMI's separate status negotiations began in 1972. See House Territorial and Insular Affairs Subcommittee Hearing, supra note 41, at 104 ("When Mr. Johnston, the Commissioner of the trust territories appeared before this committee on another matter within the past month, I enlisted his assurance that the trust territories government would not, nor would he, in any way interfere with the free and unfettered exercise of the view and will of the people of the Northern Marianas")(statement by Representative Philip Burton during a discussion of the Covenant plebiscite); id. at 116 ("the administering authority, of course, is the United States. The High Commissioner and his staff have taken no position on the Marianas status talks")(statement by the President's Personal Representative to the Covenant Negotiations)

110/
 Since there is no express Federal statute of limitations for § 1981 claims, the controlling limitations period is "the most appropriate one provided by state law." Johnson v. Railway Express Agency Inc., 421 U.S. 454, 95 S.Ct. 1716, 1721, 44 L.Ed.2d 295 (1975).

111/
 See generally Anno. Applicability of 42 USCS § 1981 to National Origin Employment Discrimination Cases, 43 A.L.R.Fed. 103.

112/
 In Runyon v. McCrary, 427 U.S. 160, 167, 96 S.Ct. 2586, 2592, 49 L.Ed.2d 15 (1976), the Supreme Court stated that § 1981 does not prohibit gender-based discrimination.

113/
 The legislative history of § 1981 Indicates that Congress affirmatively decided not to proscribe age-based discrimination. See Ortiz v. Bank of America, 547 F.Supp. 550, 555 (E.D.Cal. 1982)

114/
 Runyon v. McCrary indicated that religious discrimination is not actionable under § 1981. 426 U.S. at 167, 96 S.Ct. at 2592.

115/
 Defendants have suggested that plaintiffs' § 1983 claims "may" be barred by the applicable state statute of limitations. The Court disagrees for the reasons stated with reference to defendants' statute of limitations challenge to plaintiffs' § 1981 claims. See Part V-B-2, supra.

116/
 Covenant § 501(a) states in relevant section:

> To the extent that they are not applicable of their own force, the following provisions of the Constitution of the United States will be applicable within the Northern Mariana Islands as if the Northern Mariana Islands were one of the several states... Amendments 1 through 9, inclusive;... Amendment 14, section 1;... (emphasis added).

117/
 Balzac v. Puerto Rico, 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627 (1922); Ocampo v. United States, 234 U.S. 91, 34 S.Ct. 712, 58 L.Ed. 1231 (1914); Dowdell v. United States, 221 U.S. 325, 31 S.Ct. 590, 55 L.Ed. 753 (1911); Dorr v. United States, 195 U.S. 138, 24 S.Ct. 808, 49 L.Ed. 128 (1904); Hawaii v. Mankichi, 190 U.S. 197, 23 S.Ct. 787, 47 L.Ed. 106 (1903); Fourteen Diamond Rings v. United States, 183 U.S. 176, 22 S.Ct. 59 L.Ed. 138 (1901); Dooley v. United States, 183 U.S. 151, 22 S.Ct. 62, 46 L.Ed. 128 (1901); Huus v. N.Y. & P.R. Steamship Co., 182 U.S. 392, 21 S.Ct. 827, 45 L.Ed. 1146 (1901); Downes v. Bidwell, 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088 (1901); Armstrong v. United States, 182 U.S. 243, 21 S.Ct. 827, 45 L.Ed. 1086 (1901); Dooley v. United States. 182 U.S. 222, 21 S.Ct. 762, 45 L.Ed. 1074 (1901); DeLima v. Bidwell, 182 U.S. 1, 21 S.Ct. 743 45 L.Ed. 1041 (1901). See also Rassmusen v. United States, 197 U.S. 516, 25 S.Ct. 514, 45 L.Ed. 820 (1905) (recognizing the applicability of the Sixth Amendment jury trial right in the continental "incorporated" territory of Alaska).

118/
 "Incorporated territories" are territories which are "in all respects a part of the United States" [Downes v. Bidwell, 182 U.S. at 311, 21 S.Ct. at 796 (White, Shiras and McKenna, J.J., concurring)] and "destined for statehood from the time of acquisition." Flores de Otero, 426 U.S. 599 n.30, 96 S.Ct. at 2280 n. 31.

119/
 "Unincorporated territories" are ambiguously defined as
territories which are not "an integral part of the United States"
[Downes v. Bidwell, 182 U.S. at 312, 21 S.Ct. at 796 (White,
Shiras and McKenna, J.J., concurring)], and which the United States
acquires without the objective of annexing them into the Union as
states. Flores de Otero, 426 U.S. at 599 n.30, 96 S.Ct. at 2280
n.30.

120/
 Because due process and equal protection apply of their own
force, Covenant § 502(a)'s reference to those guarantees merely
declares rights which already inherently exist. Cf. Rassmussen v.
United States, 197 U.S. at 526, 25 S.Ct. at 518 (stating the same
conclusion as to legislation purporting to "apply" the Fifth,
Sixth and Seventh Amendments to incorporated territories).

121/
 See also Sechelong v. Trust Territory of the Pacific Islands,
2 T.T.R. 526, 528-529 (H.C.Tr.Div. 1964)(citing Balzac and treating
the Trust Territory as an unincorporated territory in ruling
implicitly that the Seventh Amendment right to jury trial in civil
cases does not apply of its own force in the Trust Territory).
Compare Sonoda v. Trust Territory of the Pacific Islands, 7 T.T.R.
442, 444-445 (H.C.App.Div. 1976)(relying upon Sechelong in rejecting
the availability of the Sixth Amendment right to jury trial in
criminal cases).

 The essential description of an "unincorporated territory"
encompasses the Trust Territory in that the Trust Territory is
neither an integral part of the United States nor destined for
statehood. See note 119, supra. Moreover, like the territories
in the Insular Cases, the Trust Territory entered United States
control "in a condition of temporary pupilage or dependence."
Dorr, 195 U.S. at 148, 24 S.Ct. at 812 (citation omitted).

122/
 See also Castro v. United States. 500 F.2d 436, 437, 448
(Ct.Cl. 1974); Camacho v. United States, 494 F.2d 1363, 1368-1369
(Ct.Cl. 1974); Fleming v. United States, 352 F.2d 533, 534 (Ct.Cl.
1965)(applying or assuming the applicability of the Fifth Amend-
ment's Just Compensation Clause). But see Pauling v. McElroy, 164
F.Supp. 390, 393 (D.D.C. 1958), aff'd 278 F.2d 252, 254 n.3
(D.C.Cir. 1960) cert.denied 364 U.S. 835, 81 S.Ct. 61, 5 L.Ed.2d
60 (1960)(indicating that the Constitution does not protect Micro-
nesian "non-resident aliens"). The District of Columbia has
narrowed Pauling by declaring that the decision stands only for
the proposition that non-resident aliens lack standing to challenge
nuclear testing if they fail to allege a specific threatened injury.

Constructores Civiles de Centroamerica S.A. v. Hannah, 459 F.2d
1183, 1190 n.13 (D.C.Cir. 1972). The holding in Ralpho v. Bell
also necessarily diminished Pauling's precedential value. In any
event, Pauling's constitutional pronouncements rest upon a question-
able foundation. The District of Columbia Circuit relied upon
Johnston v. Eisentrager, 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed.
1255 (1950). Johnson's holding applied only to alien enemies
of United States. Id. at 785, 70 S.Ct. at 947. Cases involving
alien enemies, belligerents or prisoners of war are unique decisions
which lack precedential force outside or their wartime context.
See, e.g., United States v. Tiede, 86 F.R.D. 227, 245 and nn.73,
75 (U.S.C. Berlin 1979). Johnson had no proper application in
Pauling. See also In Re Aircrash in Bali Indoensia, 684 F.2d
1301, 1308 n.6 (9th Cir. 1982)(indicating the limited reach of
Johnson and Pauling).

123/
 Although the United States is not sovereign in the Trust
Territory, it has characterized the Trust Territory as "under the
American flag." See Trusteeship Agreement for the Trust Territory
of the Pacific Islands: Hearing on S.J.Res. 143 Before the United
States Senate Committee on Foreign Relations, 80th Cong. 1st
Sess. 12 (1947)(Senate Foreign Relation Committee Hearing on S.J.
Res.. 143)("the obligations we take under the agreement are
merely obligations that we would fulfill to any people under our
flag, even apart from the engagements and covenants in this
agreement...") (testimony by Secretary of War Patterson).

124/
 Compare Hirota v. MacArthur, 338 U.S. 197, 69 S.Ct. 197
93 L.Ed. 1902 (1949)(per curiam); Standard-Vacuum Oil Co. v.
United States, 153 F.Supp. 465 (Ct.Cl. 1957), cert.denied 355
U.S. 893, 78 S.Ct. 266, 2 L.Ed.2d 191 (1957)(denying federal
constitutional protection on the ground that action by a United
States military officer was not action by the United States where
the action was taken in the officer's separate capacity as an
internationally appointed supreme military commander).

125/
 The Court has considered and rejected the possibility that the
1979 amendment to § 1983 implicitly incorporated Kleppe's § 1983
holding. Under the doctrine of "impled reenactment", when Congress
reenacts a statute it is presumed to be aware of and adopt the
statute's prior judicial construction. Lorillard v. Pons, 434 U.S.
575, 580-581, 98 S.Ct. 866, 870, 55 L.Ed.2d 40 (1978). This
principle does not apply to an unappealed district court decision.

See, e.g., White v. Winchester Country Club, 315 U.S. 32, 40 and n.14 62 S.Ct. 425, 429 and n.14, 86 L.Ed. 619 (1942)("one decision construing an act does not approach the dignity of a well-settled interpretation")(collecting cases). The legislative history of the 1979 amendment contains no indication that Kleppe was brought to Congress' attention. See generally H.R.Rep.No. 96-548, 96th Cong. 1st Sess., reprinted in 1979 U.S. Code Cong. & Ad. News 2609; Civil Suits For Violations of Civil Rights: Hearing and Markups H.R. 3343 Before the Subcommittee on Judiciary, Manpower, and Education, House of Representatives Committee on the District of Columbia, 96th Cong. 1st Sess. (1979).

126/
 The Trusteeship Agreement's congressional legislative history reflects the view of some United States officials that there is no essential difference between the United States' authority in its sovereign territory and its power in the Trust Territory. See, e.g., Senate Foreign Relations Committee Hearing on S.J.Res. 143, supra note 123, at 21-22 ("We are not sovereign there in the sense of having title, but we can exercise all the prerogatives of sovereignty")(testimony by the Chief of the State Department's Dependent Area Affairs Division); id. at 12 ("in this strategic trusteeship the powers of the trustee are extremely broad. We are not subject to the various restrictions that apply to the more ordinary kind of trusteeship")(testimony by Secretary of War Patterson); H.R.Rep.No. 889, 80th Cong. 1st Sess. p.4, reprinted in 1947 U.S. Cong. Serv. 1320 ("[i]n substance, the United States can administer the territory as if it were a colonial possession").

127/
 In cases involving injunctive and declaratory relief, the Supreme Court and the Ninth Circuit have indicated that a private right of action under Title VI exists. Lau v. Nichols, 414 U.S. 563, 566, 94 S.Ct. 786, 788, 39 L.Ed.2d 1 (1974) relied upon Title VI in sustaining a private class of action to redress unequal educational opportunities. The plaintiffs did not pray for a specific remedy, and the court remanded for "the fashioning of appropriate relief." Id. at 564, 569, 94 S.Ct. at 787, 790. In an action under 29 U.S.C. § 794, for injunctive and declaratory relief, the Ninth Circuit indicated on the basis of Lau that Title VI affords a private causes of action. King v. County of Los Angeles, 633 F.2d 876, 878 and n.3 (9th Cir. 1980). In Regents of the University of California v. Bakke, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) four justices assumed that Title VI private actions are available and four justices expressly so concluded. Id. at 283-284, 98 S.Ct. at 2745 (Powell, J.); id. at 328, 98 S.Ct. at 2767 (Brennan, White, Marshall and Blackmun, J.J., concurring in the judgment in part and dissenting in part).

id. at 418-421, 98 S.Ct. at 2813-2815 (Stevens, Stewart and Relinquist, J.J., and Burger, C.J., concurring in the judgment in part and dissenting in part). After thoroughly reviewing precedent and Title VI's legislative history, the Third Circuit held that the statute supports a private right of action for injunctive and declaratory relief. N.A.A.C.P. v. Medical Center, Inc., 599 F.2d 1247, 1259-1259 (3d Cir. 1979), Contra, Clark v. Louisa County School Board, 472 F.Supp. 321, 323 (E.D.Va. 1979).

The availability of private Title VI actions for monetary relief is unsettled. In Cannon v. University of Chicago, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), the Supreme Court held that a private right of action exists under Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681). This conclusion rested upon the court's analysis of the nearly identical language of Title VI and the legislative history of Title IX, which revealed Congress' belief that it had created a private right of action under Title VI. Id. at 694-696, 703, 99 S.Ct. at 1956-1958, 1961. The district court had ruled that monetary relief was unavailable. Cannon v. University of Chicago, 406 F.Supp. 1257, 1259 (N.D.Ill. 1976). The Seventh Circuit affirmed without comment. 559 F.2d 1063 (7th Cir. 1976). The Supreme Court's reversal stated that "petitioner may maintain her lawsuit" and did not question the availability of monetary relief. 441 U.S. at 717, 99 S.Ct. at 1968. On the basis of Cannon, the Second Circuit held that Title VI establishes a private right of action for monetary relief. Guardians Association of New York City v. Civil Service Commission 633 F.2d 232, 272-275 (2d Cir. 1980) (Coffrin and Kelleher, Circuit Judges, concurring), cert.granted ___ U.S. ___, 102 S.Ct. 997, 71 L.Ed.2d 291 (1982). Contra, id. at 254-257 (Meskill, Circuit Judge, dissenting on the Title VI monetary relief issue; Boxall v. Sequoia Union High School District, 464 F.Supp. 1104,1112 (N.D.Cal. 1979)(dictum); Rendon v. Utah State Dept. of Employment Security, 454 F.Supp. 534, 536 and n.2 (D.Utah 1978).

128/
 Plaintiffs conspicuously fail to challenge the argument that the provision of employment is not the primary purpose of federal financial assistance to the Trust Territory.

129/
 United States v. El Camino Community College District, 454 F.Supp. 825, 829 (C.D.Cal. 1978), aff'd 600 F.2d 1258 (9th Cir. 1979), cert.denied, 444 U.S. 1013, 100 S.Ct. 661, 62 L.Ed. 2d 642 (1980).

130/
 See 29 U.S.C. § 794(a)(a).

131/
 The Ninth Circuit relied in major part· upon _Tragesar·v. Libbie Rehab. Center Inc._, 590 F.2d 87 (4th Cir. 1978). However, its holding significantly omitted _Tragesar_'s additional conclusion that private suits under Title VI also are available where "discrimination in employment necessarily causes discrimination against the primary beneficiaries of the federal aid." _Id._ at ·89, If the Ninth Circuit had incorporated this statement into its _Scanlon_ holding, the Court's ruling here would have been different.

132/
 The Court accordingly rejects defendants' argument that 42 U.S.C. §2000e-1 renders Title VII inapplicable in the NMI. Section 2000e-1 states in relevant part that Title VII is inapplicable "to an employer with respect to the employment of aliens outside any State..." (emphasis added).

133/
 Defendants charge that plaintiffs failed to exhaust administrative remedies as required by 42 U.S.C. § 2000e-16. Section 2000e-16 concerns federal government employment. As decided in Part IV-B, _supra_, the Trust Territory government is administratively distinct from the United States government or its employees are not· _ipso_ _facto_ United States government employees. Therefore, it is unnecessary to consider defendants' § 2000e-16 argument. _See also_ Part VI-D, _infra_.

 Citing _Espinoza v. Farah Manufacturing Co. Inc._, 414 U.S. 86, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973), defendants also contend that Title VII is unavailable to plaintiffs because the Trust Territory government's pay scales discriminate on the basis of alienage, a practice which is·not prohibited by Title VII. Although _Espinoza_ concluded that alienage discrimination does not in intself violate Title VII, it also declared that "Title VII prohibits discrimination on the basis of citizenship whenever it has the purpose or effect of discriminating on the basis of national origin." _Id._ at 92, 94 S.Ct. at 338. Plaintiffs have alleged both racial and national origin discrimination. See note 8, _supra_.

134/
 Under 42 U.S.C. § 2000-5(g), back pay liability is limited to a two-year period preceding the EEOC filing.

135/
 Plaintiffs' Memorandum Opposing Defendants' Original Motions at 8.

136/
 Title 42 U.S.C. § 2000e-16(c); see Fischer v. S. Department of Transportation, 1349, 1351 (D.Mass. 1977).

137/
 Title 1 T.T.C. § 7 states:

 No law shall be enacted in the Trust Terri-
 tory which discriminates against any person
 on account of race, sex, language or religion;
 nor shall the equal protection of the laws be
 denied.

The Trust Territory Bill of Rights of which § 7 is part was
originally promulgated by the High Commissioner in Interim
Regulation 4-48 (1948). See Ichiro v. Bismark, 1 T.T.R. 57, 60
(H.C.Tr.Div. 1953). The High Commissioner reenacted the Bill of
Rights in 1952. See Plaintiffs Memorandum Opposing Defendants'
Renewed Motions, Exhibit I. The Congress of Micronesia enacted
the Bill of Rights in 1966.

138/
 Plaintiffs' First Amended Complaint added § 7 claims as
Count II. See note 10, supra. The Trust Territory government
and the High Commissioner waived oral argument on the renewed
dismissal and summary judgment motions and relied upon their
prior arguments against the original Complaint.